ORIGINAL

1  LERACH COUGHLIN STOIA GELLER
       RUDMAN & ROBBINS LLP
2  PATRICK J. COUGHLIN (111070)
   CHRISTOPHER M. BURKE (214799)
3  MARY LYNNE CALKINS (212171)
   655 West Broadway, Suite 1900
4  San Diego, CA 92101
   Telephone: 619/231-1058
5  619/231-7423 (fax)
   patc@lerachlaw.com
6  chrisb@lerachlaw.com
   mcalkins@lerachlaw.com
7
   SCHRAG & BAUM, P.C.                    MEADE & SCHRAG LLP
8  THOMAS F. SCHRAG (39377)              TYLER R. MEADE (160838)
   JAMES S. BAUM (52202)                 MICHAEL L. SCHRAG (185832)
9  280 Panoramic Way                     1816 Fifth Street
   Berkeley, CA 94704                    Berkeley, CA 94710
10 Telephone: 510/849-1618               Telephone: 510/843-3670
   510/841-6050 (fax)                    510/843-3679 (fax)
11 tom@schragbaum.com                    tyler@meadeschrag.com
   jim@schragbaum.com                    michael@meadeschrag.com
12
   Attorneys for Plaintiffs
13
                    UNITED STATES DISTRICT COURT
14
                   NORTHERN DISTRICT OF CALIFORNIA
15

16 ANDREW T. PIÑON, BETTY SIMM,        )   VIA FAX
   CATHY SIMM, SARA PRENTISS-SHAW,     )
17 AUDREE HALASZ, DAVID BROTMAN and )      No.
   GWEN MARTIN, On Behalf of Themselves )
18 and All Others Similarly Situated,  )   CLASS ACTION
                                       )
19              Plaintiffs,            )   COMPLAINT FOR VIOLATIONS OF THE
                                       )   NATIONAL BANK ACT, THE SHERMAN
20      vs.                            )   ACT, §17200, et seq. OF THE CAL. BUS. &
                                       )   PROF. CODE, THE CALIFORNIA
21 BANK OF AMERICA, N.A., BANK OF      )   CONSUMERS LEGAL REMEDIES ACT,
   AMERICA CORP., CAPITAL ONE          )   THE CARTWRIGHT ACT AND FOR
22 FINANCIAL CORP., CHASE BANK USA,    )   BREACH OF COVENANT AND UNJUST
   N.A., JP MORGAN CHASE & CO.,        )   ENRICHMENT
23 CITIBANK N.A., CITIGROUP, INC.,     )
   WASHINGTON MUTUAL, INC., HSBC       )
24 NORTH AMERICA HOLDINGS, INC.,       )
   HSBC FINANCE CORP. and WELLS        )
25 FARGO & COMPANY,                    )
                                       )
26              Defendants.            )
                                       )   DEMAND FOR JURY TRIAL
27 _____ )

28

Plaintiffs, on behalf of themselves and all others similarly situated, by and through their undersigned attorneys, allege, upon knowledge as to their own acts and otherwise upon information and belief, as follows:

**INTRODUCTION**

1.     This action is brought on behalf of credit cardholders who have paid excessive late fees and/or over-limit fees ("Penalty Fees"). Defendants, the largest U.S. credit card issuers ("issuing banks" or "issuers"), impose Penalty Fees of up to $39 when cardholders breach their agreement to make payments by a certain date or to make charges only within defined credit limits. The imposition of these excessive Penalty Fees violates the National Bank Act's ("NBA") prohibition against overcharging consumers. In addition, defendants have conspired to fix prices and maintain a price floor for late fees in violation of §1 of the Sherman Act.

2.     When cardholders breach their contracts with defendants by paying late or exceeding their credit limits, defendants suffer *de minimis* actual damages. Thus, defendants' imposition of up to $39 in late fees and up to $39 in over-limit fees vastly exceeds any actual damages that issuers incur and are punitive damages for contractual breaches. Under common law, punitive damages for contractual breaches are not enforceable. Any damages specified within liquidated damages clauses must represent a reasonable approximation of actual damages.

3.     To circumvent this bedrock principle of contracts law, in the mid 1990s, defendants and other credit card issuers successfully lobbied for the enactment of a statutory and regulatory regime that, when read without reference to recently clarified due process limitations, purports to allow them to impose unlimited punitive damages for breaches of credit card contracts. In 1995, the Comptroller of the Currency issued a regulation interpreting the NBA to authorize credit card issuers to impose whatever Penalty Fees are allowed by their home states. Defendants made sure to locate their credit card operations in those states that purport to allow unlimited Penalty Fees and then "exported" those punitive damages nationwide.

4.     Recent Supreme Court precedent, however, establishes that the Due Process Clause sets strict limits on the size of punitive damages relative to actual damages. In 2003, the Supreme Court held that punitive damages cannot exceed more than nine times actual compensatory damages

1   and generally should not exceed four times actual damages.  Under principles of constitutional

2   avoidance, the NBA, its regulations, and the state statutes that collectively authorize the Penalty Fees

3   must be interpreted to pass constitutional muster.  That is, the NBA must be interpreted so as to

4   comply with substantive due process principles and therefore cannot authorize Penalty Fees that

5   exceed actual damages by more than a single digit multiplier.

6          5.      Defendant banks charge Penalty Fees of up to $39 even though their damages

7   incurred for a late payment or for exceeding a prescribed credit limit are *de minimis* and are more

8   than recovered through interest charges on outstanding balances and other fees.  As a result,

9   defendants' Penalty Fees exceed the amounts that any state or federal statute and/or regulation may

10  constitutionally allow and are unenforceable punitive damages.  As such, these Penalty Fees violate

11  the NBA's prohibition against overcharging customers, when the NBA is interpreted to comport

12  with substantive due process limits.  The Penalty Fees also violate California consumer protection

13  statutes, including the Unfair Competition Law ("UCL") and the Consumers Legal Remedies Act

14  ("CLRA").  The imposition and collection of Penalty Fees also constitute unjust enrichment and a

15  breach of the covenant of good faith and fair dealing in the contracts between defendants and credit

16  cardholders.

17         6.      Moreover, the defendant banks do not compete over late fees, although they purport

18  to be fierce competitors in the credit card market.  The defendant credit card issuers, who dominate

19  the credit card market and exercise market power, enjoying a combined 70% share of the credit card

20  market, have colluded to restrain competition over the terms and fix the prices of late fees through,

21  *inter alia*, adopting, maintaining and monitoring a pricing schedule in violation of §1 of the Sherman

22  Act and California's Cartwright Act.  As a result of their collusive activities, defendants have

23  steadily ratcheted up the price of late fees.

24         7.      As a result of defendants' illegal, collusive and anticompetitive conduct, Penalty Fees

25  have skyrocketed over the last decade.  The size of the penalty for making a late payment rose from

26  an approximate average of $13 in 1995 to $34 in January 2006.  The Government Accountability

27  Office ("GAO") reported that in 2005 the top six U.S. credit card issuers assessed late fees on 35%

28

COMPLAINT FOR VIOLATIONS OF THE NATIONAL BANK ACT                                    - 2 -

1   of their active U.S. accounts, and assessed over-limit fees on 13% of their active U.S. accounts. Late

2   fees alone comprised about 70% of the card industry's $17.1 billion in fees from penalties in 2006.

3          8.      Finally, in an attempt to avoid liability, each of these large issuers has included

4   arbitration clauses in their cardholder agreements which are form contracts of adhesion imposed by

5   parties possessing far superior bargaining power and resources.  The arbitration clauses are

6   procedurally and substantively unconscionable. Each purportedly bans class actions in an attempt to

7   shield defendants from actions such as this one which are the only practical means available to

8   cardholders to vindicate important statutory rights and obtain relief from defendants' illegal conduct.

9   In addition, most of the defendants' arbitration clauses have so called "appellate" provisions that

10  would allow defendants to try the case "anew" before a panel of arbitrators if plaintiffs prevail in

11  arbitration. The cost and attendant delay of having to arbitrate a complex class arbitration twice is

12  prohibitive.  For these and other reasons the arbitration clauses are unenforceable.  Given the

13  combined market share controlled by defendants, cardholders are effectively precluded from

14  obtaining a credit card the terms of which do not include illegal and unconscionable Penalty Fees

15  and arbitration clauses.

16                                **JURISDICTION AND VENUE**

17         9.      Jurisdiction is conferred upon this Court pursuant to 15 U.S.C. §§15 and 26 (Clayton

18  Act), 12 U.S.C. §§85 and 86 (National Bank Act), and 28 U.S.C. §§1331, 1337 and 1367.

19         10.     This Court also has diversity jurisdiction over the classes defined herein pursuant to

20  28 U.S.C. §1332(d)(2) and (6) (Class Action Fairness Act of 2005) because one or more members of

21  the classes defined herein are citizens of a State different from one or more defendants and the

22  aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and

23  costs.

24         11.     Venue is proper in this district pursuant to §§4, 12 and 16 of the Clayton Act, 15

25  U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391, because defendants transact business in this district,

26  some of the plaintiffs reside in this district, and because thousands of class members are located in

27  this district.  Additionally, a substantial part of the interstate trade and commerce involved and

28  affected by the alleged violations of the antitrust laws was and is carried on in part within this

COMPLAINT FOR VIOLATIONS OF THE NATIONAL BANK ACT        - 3 -

1   district.  The acts complained of have had, and will have, substantial anticompetitive effects in this

2   district.

3                                    **THE PARTIES**

4   **Plaintiffs**

5          12.    Plaintiff Andrew T. Piñon ("Piñon") is a resident of the State of California, County of

6   San Diego.  Plaintiff Piñon has used a credit card issued by one or more of the defendants.  As a

7   result of defendants' unlawful conduct alleged herein, Piñon has paid at least one excessive and

8   illegal Penalty Fee in the four years preceding the filing of this Complaint.

9          13.    Plaintiff Betty Simm ("B. Simm") is a resident of the State of California, County of

10  San Diego.  Plaintiff B. Simm has used a credit card issued by one or more of the defendants.  As a

11  result of defendants' unlawful conduct alleged herein, B. Simm has paid at least one excessive and

12  illegal Penalty Fee in the four years preceding the filing of this Complaint.

13         14.    Plaintiff Cathy Simm ("C. Simm") is a resident of the State of California, County of

14  San Diego.  Plaintiff C. Simm has used a credit card issued by one or more of the defendants.  As a

15  result of defendants' unlawful conduct alleged herein, C. Simm has paid at least one excessive and

16  illegal Penalty Fee in the four years preceding the filing of this Complaint.

17         15.    Plaintiff Sara Prentiss-Shaw ("Shaw") is a resident of the State of California, County

18  of Alameda.  Plaintiff Shaw has used a credit card issued by one or more of the defendants.  As a

19  result of defendants' unlawful conduct alleged herein, Shaw has paid at least one excessive and

20  illegal Penalty Fee in the four years preceding the filing of this Complaint.

21         16.    Plaintiff Audree Halasz ("Halasz") is a resident of the State of California, County of

22  San Francisco.  Plaintiff Halasz has used a credit card issued by one or more of the defendants.  As a

23  result of defendants' unlawful conduct alleged herein, Halasz has paid at least one excessive and

24  illegal Penalty Fee in the four years preceding the filing of this Complaint.

25         17.    Plaintiff David V. Brotman ("Brotman") is a resident of the State of California,

26  County of Los Angeles.  Plaintiff Brotman has used a credit card issued by one or more of the

27  defendants.  As a result of defendants' unlawful conduct alleged herein, Brotman has paid at least

28  one excessive and illegal Penalty Fee in the four years preceding the filing of this Complaint.

COMPLAINT FOR VIOLATIONS OF THE NATIONAL BANK ACT                                    - 4 -

1        18.    Plaintiff Gwen Martin ("Martin") is a resident of the State of California, County of

2   Alameda.  Plaintiff Martin has used a credit card issued by one or more of the defendants.  As a

3   result of defendants' unlawful conduct alleged herein, Martin has paid at least one excessive and

4   illegal Penalty Fee in the four years preceding the filing of this Complaint.

5        19.    The existence, imposition and price of late fees and over-limit fees is material to all

6   plaintiffs and class members.

7   **The Bank of America Defendants**

8        20.    Defendant Bank of America, N.A. is a national banking association with its principal

9   place of business in Charlotte, North Carolina.  Bank of America, N.A. is an issuing bank that,

10   throughout this judicial district, issues credit cards to individuals and businesses.  Bank of America,

11   N.A. is a wholly owned subsidiary of N.B. Holdings, which in turn is a wholly owned by defendant

12   Bank of America Corporation, a Delaware corporation with its principal place of business in

13   Charlotte, North Carolina.  In January 2006, Bank of America Corporation acquired 100% of the

14   stock of MBNA America Bank, N.A. ("MBNA").  It knowingly imposed late fees and over-limit

15   fees as high as $39 and had actual knowledge of, and has knowingly participated in, the conspiracies

16   alleged in this Complaint.

17       21.    Defendant Bank of America, N.A., defendant Bank of America Corporation, N.B.

18   Holdings and MBNA are referred to collectively as "Bank of America."  Ranked by outstandings,

19   Bank of America is the largest issuer of Visa and MasterCard branded credit cards in the United

20   States.

21   **The Capital One Defendants**

22       22.    Capital One Bank, a Virginia bank with its principal place of business in Glen Allen,

23   Virginia, and Capital One F.S.B., a national bank with its principal place of business in McLean,

24   Virginia, are wholly-owned subsidiaries of defendant Capital One Financial Corporation, a Delaware

25   corporation with its principal place of business in McLean, Virginia.  Defendant Capital One

26   Financial Corporation and Capital One Bank and Capital One F.S.B. are collectively referred to as

27   "Capital One."

28

1    23.    Capital One is an issuing bank that, throughout this judicial district, issues credit

2  cards to individuals and businesses.  It knowingly imposed late fees as high as $39 and over-limit

3  fees as high as $29 and had actual knowledge of, and has knowingly participated in, the conspiracies

4  alleged in this Complaint. Ranked by outstandings, Capital One is the fourth largest issuer of Visa

5  and MasterCard branded credit cards in the United States.

6  **The Chase Defendants**

7    24.    Defendant Chase Bank USA, N.A., a New York bank with its principal place of

8  business in New York, New York, is the successor to Chase Manhattan Bank USA, N.A., and a

9  wholly-owned subsidiary of defendant JPMorgan Chase & Co., a Delaware corporation with its

10  principal place of business in New York, New York. In 2004, JP Morgan Chase & Co. completed its

11  acquisition of Bank One Corporation and Bank One, Delaware, N.A. Defendants Chase Bank USA,

12  N.A. and JP Morgan Chase & Co., and Chase Manhattan Bank USA, N.A., Bank One Corporation,

13  and Bank One, Delaware, N.A. are referred to collectively herein as "Chase."

14    25.    Chase is an issuing bank that issues credit cards to individuals and businesses

15  throughout this judicial district. It knowingly imposed late fees and over-limit fees as high as $39

16  and had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this

17  Complaint.  Ranked by outstandings, defendant Chase is the second largest issuer of Visa and

18  MasterCard branded credit cards in the United States.

19  **The Citigroup Defendants**

20    26.    Defendant Citibank N.A., a bank with its principal place of business in New York,

21  New York, is a subsidiary of defendant Citigroup, Inc., a Delaware corporation with its principal

22  place of business in New York, New York.  Citicorp merged into defendant Citigroup, Inc., on

23  August 1, 2005. Defendant Citibank N.A., Citicorp, and defendant Citigroup, Inc. are collectively

24  referred to herein as "Citigroup."

25    27.    Citigroup is an issuing bank that, throughout this judicial district, issues credit cards

26  to individuals and businesses. It knowingly imposed late fees and over-limit fees as high as $39 and

27  had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this

28

1  Complaint.  Ranked by outstandings, Citigroup is the third largest issuer of Visa and MasterCard

2  branded cards in the United States.

3  **The Washington Mutual Defendants**

4       28.     Defendant Washington Mutual, Inc. is a Washington corporation with its principal

5  place of business in Seattle, Washington.  In October 2005, Washington Mutual, Inc. completed its

6  acquisition of Providian.  Defendant Washington Mutual, Inc. and Providian are collectively referred

7  to as "Washington Mutual."

8       29.     Washington Mutual is an issuing bank that, throughout this judicial district, issues

9  credit cards to individuals and businesses.  It knowingly imposed late fees as high as $39 and over-

10  limit fees as high as $35 and had actual knowledge of, and has knowingly participated in, the

11  conspiracies alleged in this Complaint.  Ranked by outstandings, Washington Mutual is the sixth

12  largest issuer of Visa and MasterCard branded credit cards in the United States.

13  **The HSBC Defendants**

14       30.     Defendant HSBC North America Holdings, Inc. ("HSBC North America") is a

15  holding company incorporated under Delaware law, with its principal place of business in Prospect

16  Heights, Illinois.  HSBC North America is a holding company subsidiary of HSBC Holdings plc

17  ("HSBC Holdings"), which is a public limited company incorporated in England and Wales.  HSBC

18  North America is the holding company for all of HSBC's United States and Canadian businesses.

19       31.     HSBC Bank USA, N.A. is a national banking association organized under the laws of

20  the United States with its principal place of business located in Wilmington, Delaware.  Defendant

21  HSBC Finance Corporation is a Delaware corporation with its principal place of business in Prospect

22  Heights, Illinois.  HSBC Card Services includes the GM card, HSBC Bank Nevada, N.A., HSBC

23  Bank U.S.A., N.A., HSBC Finance and Orchard Bank

24       32.     Defendants HSBC North America and HSBC Finance Corporation (and its

25  predecessor Household International, Inc.) and HSBC Holdings, HSBC Bank USA, N.A. and the

26  HSBC Card Services subdivision of HSBC North America and all their predecessors, affiliates and

27  subsidiaries are collectively referred to as "HSBC."  HSBC is an issuing bank that, throughout this

28  judicial district, issues credit cards to individuals and businesses.  HSBC knowingly imposed late

COMPLAINT FOR VIOLATIONS OF THE NATIONAL BANK ACT          - 7 -

1   fees as high as $39 and over-limit fees as high as $35 and had knowledge of and has knowingly

2   participated in the conspiracies alleged in the Complaint. Ranked by outstandings, HSBC was the

3   fifth largest issuer of Visa and MasterCard branded credit cards in the United States in 2006.

4   **The Wells Fargo Defendants**

5        33.    Defendant Wells Fargo & Company ("Wells Fargo") is a Delaware corporation with

6   its principal place of business in San Francisco, California. Wells Fargo & Company is an issuing

7   bank that, throughout this judicial district, issues credit cards through its wholly owned subsidiaries

8   Wells Fargo Bank, N.A., Wells Fargo Financial Bank and Wells Fargo Financial National Bank to

9   individuals and businesses. Defendants Wells Fargo & Company, Wells Fargo Bank, N.A., Wells

10   Fargo Financial Bank and Wells Fargo Financial National Bank are collectively referred to as "Wells

11   Fargo." Wells Fargo knowingly imposed late fees and over-limit fees as high as $35 and had actual

12   knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.

13   Ranked by outstandings, Wells Fargo is the seventh largest issuer of Visa and MasterCard branded

14   credit cards in the United States.

15        34.    Defendants Bank of America, Capital One, Chase, Citigroup, Washington Mutual,

16   HSBC and Wells Fargo are referred to here collectively as "defendants."

17   <center>**CO-CONSPIRATORS**</center>

18        35.    Various other persons, firms, corporations, organizations, and other business entities,

19   some unknown and others known, not joined as defendants in this Complaint or identified as co-

20   conspirators herein, have also participated as co-conspirators in the violations alleged and have

21   performed acts and made statements in furtherance thereof. Co-conspirators include, but are not

22   limited to, the following: financial institutions that issue credit cards, payment industry media, third-

23   party processors such as First Data Resources ("FDR") and Total Systems Services, Inc. ("TSYS")

24   that process payment card transactions, credit card industry consultants, trade associations such as

25   the American Bankers Association, and the two major credit card networks, Visa U.S.A. ("Visa")

26   and MasterCard International, Inc. ("MasterCard").

27        36.    At all times herein mentioned, each and every defendant and co-conspirator was an

28   agent of each and every other defendant and co-conspirator. Each of the defendants aided and

1 | abetted the commission of unlawful, unfair and deceptive business practices by their co-defendants
2 | or co-conspirators.  Defendants and co-conspirators were aware, or should have been aware, that the
3 | imposition of excessive Penalty Fees was unlawful, unfair and deceptive as alleged herein.  By
4 | facilitating the imposition, terms and pricing of Penalty Fees, defendants and their co-conspirators
5 | substantially assisted and/or encouraged their co-defendants and co-conspirators in the commission
6 | of the unlawful, unfair and deceptive practices alleged herein.

## CLASS ACTION ALLEGATIONS

8 | 37.     Plaintiffs bring this action pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules
9 | of Civil Procedure.  Plaintiffs seek to represent the following classes:

10 | 38.     ***Nationwide Injunctive Relief Class***: All holders of credit cards (excluding federal,
11 | state and local governmental entities, defendants, their directors, officers and members of their
12 | families) issued by defendants Bank of America, Capital One, Chase, Citigroup, HSBC, Washington
13 | Mutual and Wells Fargo.

14 | 39.     ***Nationwide Damages Classes***

15 | (a)     ***Nationwide Late Fee Damages Class***: All holders of credit cards issued by
16 | defendants Bank of America, Capital One, Chase, Citigroup, HSBC, Washington Mutual and Wells
17 | Fargo (excluding federal, state and local governmental entities, defendants, their directors, officers
18 | and members of their families) who have been charged a late fee from January 31, 2003 through the
19 | trial of this matter (the "Class Period").

20 | (b)     ***Nationwide Over-Limit Fee Damages Class***:  All holders of credit cards
21 | issued by defendants Bank of America, Capital One, Chase, Citigroup, HSBC, Washington Mutual
22 | and Wells Fargo (excluding federal, state and local governmental entities, defendants, their directors,
23 | officers and members of their families) who have been charged an over-limit fee during the Class
24 | Period.

25 | 40.     ***California Classes***

26 | (a)     ***California Late Fees Class***: All holders of credit cards in California issued by
27 | defendants Bank of America, Capital One, Chase, Citigroup, HSBC, Washington Mutual and Wells

28 |

1   Fargo (excluding federal, state and local governmental entities, defendants, their directors, officers

2   and members of their families) who have been charged a late fee during the Class Period.

3           (b)   ***California Over-Limit Fee Class***: All holders of credit cards in California

4   issued by defendants Bank of America, Capital One, Chase, Citigroup, HSBC, Washington Mutual

5   and Wells Fargo (excluding federal, state and local governmental entities, defendants, their directors,

6   officers and members of their families) who have been charged an over-limit fee during the Class

7   Period.

8        41.   The members of the classes are so numerous and geographically dispersed that

9   joinder of all class members in this action is impracticable.

10        42.   Plaintiffs' claims are typical of the claims of the members of the classes, because

11   plaintiffs and all members of the classes were damaged by the same wrongful conduct of the

12   defendants, and will continue to be so damaged and/or are threatened with such damage in the

13   absence of injunctive relief, and defendants have acted on grounds generally applicable to the

14   classes.

15        43.   Plaintiffs will fairly and adequately protect the interests of the classes. The interests

16   of plaintiffs are coincident with, and not antagonistic to, those of the classes. In addition, plaintiffs

17   are represented by counsel who are experienced and competent in the prosecution of complex class

18   action antitrust and consumer litigation, including complex class actions involving credit card

19   corporations and financial institutions.

20        44.   Questions of law and fact are common to the members of the classes and the

21   defendants and their co-conspirators have acted on grounds generally applicable to all members of

22   the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief

23   with respect to the classes as a whole. Among the questions of law and fact common to the classes

24   are:

25           (a)   Whether late fees imposed by defendants constitute penalties and/or punitive

26   damages for breach of contract;

27           (b)   Whether over-limit fees imposed by defendants constitute penalties and/or

28   punitive damages for breach of contract;

1        (c)     Whether the various federal and state statutes and regulations that purportedly

2  authorize the imposition of Penalty Fees as contractual punitive damages must be interpreted to

3  comply with substantive due process requirements;

4        (d)     Whether the Penalty Fees defendants imposed during the Class Period exceed

5  the levels allowed by the statutes and regulations as constitutionally interpreted;

6        (e)     Whether if those relevant statutes and regulations are not susceptible to an

7  interpretation that is consistent with due process requirements, they must be invalidated as

8  unconstitutional and the common law ban on punitive damages must be reinstated;

9        (f)     Whether defendants charged members of the classes late fees that constituted

10  unlawful, deceptive and/or unfair punitive damages for breach of contract in violation of statutes and

11  common law including the NBA, the UCL and the CLRA;

12        (g)     Whether defendants charged members of the classes over-limit fees that

13  constituted unlawful, deceptive and/or unfair punitive damages for breach of contract in violation of

14  statutes and common law including the NBA, the UCL and the CLRA;

15        (h)     Whether the defendants and their co-conspirators engaged in a contract,

16  combination, or conspiracy to restrain competition over the terms and pricing of late fees;

17        (i)     The duration and extent of the contract, combination or conspiracy;

18        (j)     The mechanisms used to accomplish the contract, combination or conspiracy;

19        (k)     Whether the defendants and their co-conspirators violated §1 of the Sherman

20  Act and the Cartwright Act;

21        (l)     Whether members of the classes are threatened with continuing harm from the

22  violations of federal and state statutes and common law as alleged herein; and

23        (m)     Whether defendants unjustly enriched themselves.

24      45.     The defendants have acted and continue to act on grounds generally applicable to the

25  classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with

26  respect to the classes as a whole.

27      46.     Class action treatment is superior to the alternatives, if any, for the fair and efficient

28  adjudication of the controversy.

COMPLAINT FOR VIOLATIONS OF THE NATIONAL BANK ACT

47.   Plaintiffs know of no unusual difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## BACKGROUND: THE CREDIT CARD MARKET

48.   Credit cards, like Visa-branded and MasterCard-branded cards, are payment devices that a consumer can use to make purchases through a revolving line of credit, the terms of which are set by the card issuer.  Visa- and MasterCard-branded cards are issued by banks or their affiliates. Consumers can make credit card purchases from unrelated merchants without accessing or reserving the consumer's funds at the time of the purchase.

49.   Credit cards provide the cardholder the option of (i) paying all charges within a set period after a monthly bill is presented, or (ii) paying only a portion of the charge within that time and paying the remainder in monthly installments plus a finance or interest charge.

50.   Visa and MasterCard (the "networks") each own and operate open credit card networks through which their respective member banks (*i.e.*, issuing banks or issuers) can issue credit cards to cardholders under licensing agreements with Visa or MasterCard.  Among other things, Visa and MasterCard: (i) implement systems and technologies to authorize, clear, and settle credit card transactions; (ii) market and promote their brand names; (iii) develop and impose rules; and (iv) assess fees on their member banks.  These activities are principally financed through fees and assessments levied on their members, including defendants.

51.   In addition, merchants contract with Visa and MasterCard member banks ("acquiring banks" or "acquirers") to accept their cards.  The cardholder accounts are owned by the issuing banks and transactions are processed by the banks themselves, or by third-party processors such as First Data Resources, Inc. ("FDR") or Total System Services, Inc. ("TSYS").  FDR and/or TSYS provide processing services for each defendant.  The services processors provide are typically receiving authorization and clearing data from Visa's and MasterCard's systems, housing cardholder account information, generating and mailing monthly statements, calculating cardholder charges and fees, producing and mailing plastic cards, providing customer services in the issuer's name to cardholders, and providing reporting to the banks on their card portfolios.

52.     In a typical credit card transaction on the Visa or MasterCard networks, a merchant accepts a credit card from a customer for the provision of goods and services. The merchant swipes the card. The information is transmitted to the bank that issued the card for authorization. After the issuing bank electronically authorizes the transaction, the merchant submits the Visa or MasterCard card transaction to his acquiring bank. The acquirer remits the transaction to the network for clearing and settlement and pays the merchant less an amount known as the merchant discount. Clearing is the movement of data that describes the transaction from the acquirer to the issuer, and settlement is the movement of funds by the networks between the issuer and the acquirer. The networks receive and route transactions to the issuers or their designated processors. The networks then report the issuer and acquirer settlement positions, and remit the amounts owed to the acquirers from the issuers less the interchange amount owed to the issuers. The issuers bill the cardholders. The foregoing is generally accomplished electronically through the networks' clearing and processing systems or those of a third-party processor.

**RELEVANT MARKET**

53.     The relevant market is the market for credit cards issued by U.S. financial institutions. Credit cards are a separate market from other forms of payment, such as cash, checks and debit cards for a variety of reasons, including that (i) credit cards are considered safer than carrying large amounts of cash; (ii) credit cards are more widely accepted than checks; (iii) credit cards offer a credit function that debit cards do not and thus forms of payment such as cash, checks and debit cards are not a close substitute for a credit card.

54.     Credit cards occupy a unique position in today's economy in that they are a practical necessity for most consumers to rent a car, reserve a hotel, buy airline tickets, engage in Internet commerce and secure numerous other services and products. Many consumers view credit cards as an indispensable part of every day life. Cardholders in the United States each have an average of 4.95 credit cards and there are approximately 464 million credit card accounts in the United States.

55.     Other forms of payment such as cash, checks and debit cards are not readily interchangeable with credit cards by virtue of the credit function that allows a cardholder to make purchases worth more than the balance they have in a deposit account and to delay payment for a

1   specific period of time. *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001),

2   *aff'd*, 344 F.3d 229 (2d Cir. 2003).  The trial court in that case ruled that "defendants' [Visa and

3   MasterCard] own admissions and evidence of consumer preferences support . . . and demonstrate the

4   existence of a general purpose card market separate from other forms of payment."  The court also

5   explained that "consumers strongly prefer to use credit and charge cards rather than cash or checks,

6   because they generally do not want to carry large sums of cash to make large purchases, and checks

7   generally have much lower merchant acceptance than either cash or general purpose cards. . . . Also,

8   consumers benefit from the general purpose card's credit function, which allows for the choice to

9   purchase now and pay later." *Id.* at 336.  Accordingly, the court held that "because card consumers

10   have very little sensitivity to price increases in the card market and because neither consumers nor

11   the defendants view debit, cash and checks as reasonably interchangeable with credit cards, general

12   purpose cards constitute a product market." *Id.* at 338.  The Second Circuit upheld the trial court's

13   ruling that credit cards constitute a separate and relevant market. *United States v. Visa U.S.A., Inc.*,

14   344 F.3d 229, 239 (2d Cir. 2003).

15         56.   The geographic market is the market for credit cards in the United States.

16         57.   Defendants' combined market share of the United States credit card market exceeds

17   70% as of 2006, and defendants collectively exercise market power.

18                              **TRADE AND COMMERCE**

19         58.   The activities of the defendants and their co-conspirators, as described in this

20   Complaint, took place within interstate commerce, had and continue to have a substantial effect on

21   interstate trade and commerce and have unreasonably restrained, and continue to restrain, interstate

22   trade and commerce.  The acts complained of in this Complaint have harmed the business and

23   property of plaintiffs and members of the classes and present a continued threat of loss and damage

24   to plaintiffs and the members of the classes.

25                              **FACTUAL ALLEGATIONS**

26         59.   Credit card contracts state that monthly payments must be made by the due date,

27   which are printed on the billing statement or for electronic payors displayed on the issuer's Web site.

28   These agreements also limit the amount of credit available to the cardholder.

COMPLAINT FOR VIOLATIONS OF THE NATIONAL BANK ACT                                    - 14 -

60.   For the first few decades after credit cards were introduced in the 1950s, issuers commonly charged a single fixed interest rate of around 20% as the annual percentage rate ("APR") that covered most of an issuer's expenses associated with card use.  By 1980, issuers also charged cardholders an annual fee of $20 to $50.  Generally, credit cards were only offered to the most creditworthy U.S. consumers.  In the late 1980s and early 1990s, few issuers charged Penalty Fees for making late payments or exceeding the credit limit set by the issuer.  When such Penalty Fees were assessed, they were relatively small.  For example, the typical late fee in the 1980s ranged from just $5 to $10.  This is not surprising because their costs from late payment or exceeding one's credit limit are *de minimis* and it is generally unlawful to impose penalties or punitive damages for breach of contract.

61.   In the period from 1990 through 2004 interest rates declined substantially.  This decline and competition over interest rates and annual fees resulted in lower credit card interest rates and the elimination of annual fees.  To offset the resultant decline in revenue, issuers made an "end run" around the prohibition on contractual punitive damages in order to increase Penalty Fee revenue.  In 1995, the banking and payment card industry successfully lobbied the Comptroller of the Currency to issue a regulation interpreting Section 85 of the NBA to permit nationally chartered bank issuers to charge customers in any state whatever late and over-limit fees are permitted in the bank's home state.  *See* 12 U.S.C. §85 and 12 C.F.R. §7.4001.  The banking and payment card industry had previously lobbied certain state legislatures to allow issuers located in their states to impose unlimited Penalty Fees.  The 1995 regulation along with the laws of the banks' home states appeared to allow issuers to impose unlimited punitive fees for late fees and over-limit fees.

**The Rise in Late Fees**

62.   After this regulation went into effect, issuers made sure to locate their credit card operations in the states purportedly allowing unlimited Penalty Fees.  The issuers then increased their late fees and over-limit fees dramatically.  By 1998, cardholder fee income had grown by nearly 160%, from $7.3 billion in 1994 to $18.9 billion in 1998.  Between 1994 and 1999, Penalty Fees doubled in actual dollar averages.  Late fees were the driving force in the issuers' increased fee

1  income.  By mid-1999, more than 90% of the industry was charging late fees, and 85% of the

2  industry was charging over-limit fees.

3         63.     Between 1995 and 2000, late fees rose 104%.  Between 2000 and 2006, late fees rose

4  another 27%.  Defendants' late fees in this period were priced within $5 of each other.  By 2005, late

5  fees had risen from an average of $11.71 in 1994 to $34.42 in 2006, an increase of over 193%.  Six

6  of the nation's top ten issuers charged up to a $39 late fee in 2006.

7         64.     In 2006, issuers earned roughly $79 billion from late fees and interest charges.  The

8  fees were likened to "a hidden tax on card holders" during the Senate Committee on Banking

9  hearing on the credit card industry on January 25, 2007.

10  **The Rise in Over-Limit Fees**

11         65.     Over-limit fees are imposed when consumers exceed the credit limit set forth in the

12  credit agreement.  In the mid 1990s, issuers typically assessed an over-limit fee only if the

13  cardholder exceeded the credit line by 5%-10%.  And most issuers would only assess an over-limit

14  fee if the closing balance for the month was above the credit line.  But by 2005, top issuers such as

15  defendants MBNA and Chase were charging fees for exceeding the credit limit at *any* time during

16  the billing cycle.  Moreover, finance charges added to an account after the close of the current billing

17  cycle can cause an over-limit status, even if the minimum payment has already been posted.  Not

18  surprisingly, instances where defendant issuers are not charging over-limit fees are on portfolios

19  marketed to affluent cardholders with high credit limits and who can most afford to pay over-limit

20  fees.  Because defendants have not charged over limit fees on certain portfolios, the percentage of

21  accounts subject to over-limit fees decreased slightly between 2003 and 2005, while the price of the

22  over-limit fee imposed on less affluent accounts has soared to outrageous levels.

23         66.     Since June 1993, over-limit fees have soared by over 150%.  In the five years

24  between 1994 and 1999, average over-limit fees grew 96%, from $12.75 to $24.96.  Between 1998

25  and 2003, over-limit fees increased 52%, from an average of $18.59 to $28.21.  Between 2001 and

26  2004, over-limit fees increased 17%.  By 2005, the most common over-limit fee among major

27  issuers was up to $35, some issuers were already charging up to $39 on accounts with higher

28  balances.

COMPLAINT FOR VIOLATIONS OF THE NATIONAL BANK ACT                              - 16 -

**THE CURRENT LEVEL OF PENALTY FEES IS UNLAWFUL**

67.     Penalty Fees are a form of punitive damages imposed for breaches of the cardholders' contractual obligation to make payments by a certain date or stay within contractual credit limits.

68.     There is no legitimate business justification or cost basis for the level of over-limit fees or late fees defendants charge. They are virtually pure profit for the defendants. Purported cost justifications for Penalty Fees include the cost of funds for late payment, cardholder default and administration relating to collections. However, each of these purported costs is captured by the interchange fee the issuers collect on each transaction, and through interest rates and finance charges imposed on the entire balance due, even though cardholders are late only on remitting a smaller, minimum payment. Moreover, late payers tend to be charged higher interest rates, called "penalty rates," on their entire balances. A penalty rate may exceed 30% and generate substantial additional revenues from late payments.

69.     Late fees therefore represent double dipping by the issuers, because cardholders already pay interest on balances not paid in full by the due date. Issuers that jack up interest rates as punishment for late payment engage in *triple* dipping. An over-limit fee resulting in part from assessed late fees and interest charges is the *quadruple dip*. To illustrate this quadruple dipping: for a $100 balance with 29% interest plus a $39 late fee, the real rate of interest is 68%. Adding a $39 over-limit fee, and the real rate of interest jumps to over 107%. Hit the cardholder with compound interest on the fee and with over-limit fees two or three months in a row, the interest rate could swell to over 350% or higher.

70.     Issuers conduct their business as though the NBA, its regulations, and state statutes give them discretion to impose unlimited punitive damages for breaches of credit card agreements. In 2003, however, the United States Supreme Court held that the U.S. Constitution's Due Process Clause strictly limits punitive damages to no more than nine times actual damages. *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003). To the extent the NBA allows Penalty Fees for breaches of contract, the statute must be interpreted to comport with due process principles. Defendants incur *de minimis* or no actual damages as a result of late payments or over limit charges. Increased interest revenue on outstanding balances more than compensates defendants for any

1  damages suffered due to late payments or over-limit charges. Thus, under *State Farm*, the NBA and

2  state laws only allow defendants to impose contractual penalties of, at most, nine times their actual

3  damages. Yet, they knowingly impose late fees and over-limit fees of up to $39. The late fees and

4  over-limit fees they impose vastly exceed what the NBA allows when interpreted to comply with

5  substantive due process limits. These overcharges also violate California's UCL and CLRA and

6  permit defendants to unjustly enrich themselves. Thus, defendants' Penalty Fees constitute illegal

7  overcharging of consumers in violation of the NBA.

8  **The Conspiracy to Fix and Maintain Disproportionately High Late Fees**

9      71.    Defendants and their co-conspirators have combined, conspired and contracted to

10  adopt, implement and maintain late fees at supra-competitive levels.

11      72.    In the past, credit card issuers made most of their profits from interest and annual

12  fees. In the late 1980s, the major credit card issuers charged interest rates of 17%-20%. During this

13  time the major credit card issuers all charged an annual fee.

14      73.    In 1990, AT&T launched the Universal Card credit products, which had the feature of

15  no annual fees. This was followed in 1992 by Household Financial Services' (now HSBC) GM

16  Card with no annual fee and a 5% purchase earning credit toward the purchase of GM vehicles.

17  Faced with such competition, issuers gradually eliminated annual fees on standard non-reward cards

18  and introduced reward and affinity programs.

19      74.    Interest rates in general continued to decline in the early 1990s, due in part to

20  increased interest rate competition among the issuers. This, combined with the changes wrought by

21  new market entrants, resulted in historically low credit card interest rates. Between 1990 and 2004,

22  the average APR dropped from over 18% to just over 12%.

23      75.    Consequently, issuers' revenue from interest and annual fees as a percentage of total

24  revenue has fallen dramatically. While interest income accounted for about 75% of issuers' revenue

25  in 1991, it dropped to about 60% of issuers' revenue in 2003. The percentage of income that issuers

26  derive from annual fees has also declined precipitously.

27      76.    As those two big revenue streams shrank, issuers found other revenue sources by

28  introducing and/or increasing "ancillary" sources of income. Between 1996 and 2003, late fee

COMPLAINT FOR VIOLATIONS OF THE NATIONAL BANK ACT       - 18 -