LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN (111070)
CHRISTOPHER M. BURKE (214799)
ELISABETH A. BOWMAN (147393)
MARY LYNNE CALKINS (212171)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
patc@lerachlaw.com
chrisb@lerachlaw.com
mcalkins@lerachlaw.com
lisab@lerachlaw.com

SCHRAG & BAUM, P.C.                    MEADE & SCHRAG LLP
THOMAS F. SCHRAG (39377)               TYLER R. MEADE (160838)
JAMES S. BAUM (52202)                  MICHAEL L. SCHRAG (185832)
280 Panoramic Way                      1816 Fifth Street
Berkeley, CA  94704                    Berkeley, CA 94710
Telephone:  510/849-1618               Telephone:  510/843-3670
510/841-6050 (fax)                     510/843-3679 (fax)
tom@schragbaum.com                     tyler@meadeschrag.com
jim@schragbaum.com                     michael@meadeschrag.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re LATE FEE AND OVER-LIMIT FEE LITIGATION | No. C-07-0634-SBA |
| | CLASS ACTION |
| This Document Relates To: | CONSOLIDATED COMPLAINT |
| ALL ACTIONS. | DEMAND FOR JURY TRIAL |

1    Plaintiffs, on behalf of themselves and all others similarly situated, by and through their

2 undersigned attorneys, allege, upon knowledge as to their own acts and otherwise upon information

3 and belief, as follows:

4                                    **INTRODUCTION**

5    1.    This action is brought on behalf of credit cardholders who have paid excessive late

6 fees and/or over-limit fees ("Penalty Fees").  Defendants, the largest U.S. credit card issuers

7 ("issuing banks," "defendants" or "issuers"), impose Penalty Fees of up to $39 when cardholders

8 breach their agreement to make payments by a certain date or to make charges only within defined

9 credit limits.  The imposition of these excessive Penalty Fees violates the National Bank Act's

10 ("NBA") and the Depository Institutions Deregulation and Monetary Control Act of 1980's

11 ("DIDA") prohibitions against overcharging consumers.  In addition, defendants have conspired to

12 fix prices and maintain a price floor for late fees in violation of §1 of the Sherman Act.

13    2.    When cardholders breach their contracts with defendants by paying late or exceeding

14 their credit limits, defendants suffer no, or at most, *de minimis* actual damages.  When payment is

15 delayed, defendants recover the time value of the delayed payment in the form of interest charges,

16 usually extremely high interest charges.  Any other damages are non-existent or extremely small.

17 Thus, defendants' imposition of up to $39 in late fees and up to $39 in over-limit fees vastly exceeds

18 any actual damages that issuers incur and thereby constitutes the exaction of punitive liquidated

19 damages for contractual breaches.  Under the common law, punitive liquidated damages for

20 contractual breaches are not enforceable.  Any damages specified within liquidated damages clauses

21 must represent a reasonable approximation of actual damages.  The damages specified by the

22 defendants are not reasonable approximations of actual damages but rather are grossly excessive and

23 punitive.

24    3.    To circumvent the common law principle of the unenforceability of punitive

25 liquidated damages clauses, in the mid 1990s, defendants and other credit card issuers successfully

26 lobbied for the enactment of a statutory and regulatory regime that, when read without reference to

27 recently clarified due process limitations, purports to allow them to impose and enforce excessive

28 and even unlimited punitive damages for breaches of credit card contracts. In 1995, the Comptroller

CONSOLIDATED COMPLAINT                          No. C-07-0634-SBA        -1-

1  of the Currency issued a regulation interpreting the NBA to authorize credit card issuers to impose

2  whatever Penalty Fees are allowed by the issuer's home states.  Defendants made sure to locate their

3  credit card operations in those states that purport to allow unlimited Penalty Fees and then, pursuant

4  to the 1995 Comptroller of the Currency regulation, "exported" those punitive damages nationwide.

5        4.     Subsequent United States Supreme Court precedent has established that the Due

6  Process Clauses of the United States Constitution preclude the enforcement of excessive punitive

7  damages.  In *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S. Ct. 1513 (2003), the

8  United States Supreme Court held that the imposition of excessive punitive damages violates

9  constitutional due process principles.  Absent exceptional circumstances (inapplicable to the facts

10 alleged in this Complaint), punitive damages cannot exceed more than nine times actual losses and

11 generally should be far lower.  Following *State Farm*, under principles of constitutional avoidance,

12 the state and federal statutes and regulations that purport to sanction the defendants' collection of

13 excessive Penalty Fees from the plaintiffs and members of the proposed classes must be interpreted

14 in ways that are consistent with due process principles to pass constitutional muster; if they are not

15 subject to a constitutionally permissible construction, they must be declared unconstitutional.  The

16 penalty charges imposed on the plaintiffs and the proposed classes were and are excessive under

17 these due process principles.

18       5.     For that reason, the Penalty Fees charged by defendants violate the NBA and DIDA's

19 prohibition against overcharging customers.  The Penalty Fees also violate California consumer

20 protection statutes, including the Unfair Competition Law ("UCL") and the Consumers Legal

21 Remedies Act ("CLRA").  The imposition and collection of Penalty Fees also constitute unjust

22 enrichment and a breach of the covenant of good faith and fair dealing in the contracts between

23 defendants and credit cardholders.

24       6.     Moreover, the issuing banks do not compete over late fees, although they purport to

25 be fierce competitors in the credit card market.  The issuers, who dominate the credit card market

26 and exercise market power, enjoying a combined 70% share of the credit card market, have colluded

27 to restrain competition over the terms and fix the prices of late fees through, *inter alia*, adopting,

28 maintaining and monitoring a pricing schedule in violation of §1 of the Sherman Act and

1   California's Cartwright Act.  As a result of their collusive activities, defendants have steadily

2   ratcheted up the price of late fees.

3          7.     As a result of defendants' illegal, collusive and anticompetitive conduct, Penalty Fees

4   have skyrocketed over the last decade and are far above what would exist in a competitive market.

5   The size of the penalty for making a late payment rose from an approximate average of $13 in 1995

6   to $34 in January 2006.  The Government Accountability Office ("GAO") reported that in 2005 the

7   top six U.S. credit card issuers assessed late fees on 35% of their active U.S. accounts, and assessed

8   over-limit fees on 13% of their active U.S. accounts.  Late fees alone comprised about 70% of the

9   card industry's $17.1 billion revenue from penalty fees in 2006.

10         8.     Finally, in an attempt to avoid liability, each of these large issuers has included

11  arbitration clauses in their cardholder agreements which are form contracts of adhesion imposed by

12  parties possessing far superior bargaining power and resources.  The arbitration clauses are

13  procedurally and substantively unconscionable.  Each purportedly bans class actions in an attempt to

14  shield defendants from actions such as this one which are the only practical means available to

15  cardholders to vindicate important statutory rights and obtain relief from defendants' illegal conduct.

16  In addition, most of the defendants' arbitration clauses have so called "appellate" provisions that

17  would allow defendants to try the case "anew" before a panel of arbitrators if plaintiffs prevail in

18  arbitration.  The cost and attendant delay of having to arbitrate a complex class arbitration twice is

19  prohibitive.  For these and other reasons the arbitration clauses are unenforceable.  Given the

20  combined market share controlled by defendants, cardholders are effectively precluded from

21  obtaining a credit card the terms of which do not include illegal and unconscionable Penalty Fees

22  and arbitration clauses.

23                            **JURISDICTION AND VENUE**

24         9.     Jurisdiction is conferred upon this Court pursuant to 15 U.S.C. §§15 and 26 (Clayton

25  Act), 12 U.S.C. §§85 and 86 (National Bank Act), 12 U.S.C. §183(d) (Depository Institutions

26  Deregulation and Monetary Control Act of 1980), and 28 U.S.C. §§1331, 1337 and 1367.

27         10.    This Court also has diversity jurisdiction over the classes defined herein pursuant to

28  28 U.S.C. §1332(d)(2) and (6) (Class Action Fairness Act of 2005) because one or more members of

the classes defined herein are citizens of a State different from one or more defendants and the aggregate amount in controversy exceeds five million dollars ($5,000,000), exclusive of interest and costs.

11. Venue is proper in this district pursuant to §§4, 12 and 16 of the Clayton Act, 15 U.S.C. §§15, 22 and 26, and 28 U.S.C. §1391, because defendants transact business in this district, some of the plaintiffs reside in this district, and because thousands of class members are located in this district. Additionally, a substantial part of the interstate trade and commerce involved and affected by the alleged violations of the antitrust laws was and is carried on in part within this district. The acts complained of have had, and will have, substantial anticompetitive effects in this district.

## THE PARTIES

**Plaintiffs**

12. Plaintiff Andrew T. Piñon ("Piñon") is a resident of the State of California, County of San Diego. Plaintiff Piñon has used a credit card issued by one or more of the defendants. As a result of defendants' unlawful conduct alleged herein, Piñon has paid at least one excessive and illegal Penalty Fee in the four years preceding the filing of this Complaint.

13. Plaintiff Betty Simm ("B. Simm") is a resident of the State of California, County of San Diego. Plaintiff B. Simm has used a credit card issued by one or more of the defendants. As a result of defendants' unlawful conduct alleged herein, B. Simm has paid at least one excessive and illegal Penalty Fee in the four years preceding the filing of this Complaint.

14. Plaintiff Cathy Simm ("C. Simm") is a resident of the State of California, County of San Diego. Plaintiff C. Simm has used a credit card issued by one or more of the defendants. As a result of defendants' unlawful conduct alleged herein, C. Simm has paid at least one excessive and illegal Penalty Fee in the four years preceding the filing of this Complaint.

15. Plaintiff Sara Prentiss-Shaw ("Shaw") is a resident of the State of California, County of Alameda. Plaintiff Shaw has used a credit card issued by one or more of the defendants. As a result of defendants' unlawful conduct alleged herein, Shaw has paid at least one excessive and illegal Penalty Fee in the four years preceding the filing of this Complaint.

1        16.    Plaintiff Audree Halasz ("Halasz") is a resident of the State of California, County of

2  San Francisco.  Plaintiff Halasz has used a credit card issued by one or more of the defendants.  As a

3  result of defendants' unlawful conduct alleged herein, Halasz has paid at least one excessive and

4  illegal Penalty Fee in the four years preceding the filing of this Complaint.

5        17.    Plaintiff David V. Brotman ("Brotman") is a resident of the State of California,

6  County of Los Angeles.  Plaintiff Brotman has used a credit card issued by one or more of the

7  defendants.  As a result of defendants' unlawful conduct alleged herein, Brotman has paid at least

8  one excessive and illegal Penalty Fee in the four years preceding the filing of this Complaint.

9        18.    Plaintiff Gwen Martin ("Martin") is a resident of the State of California, County of

10  Alameda.  Plaintiff Martin has used a credit card issued by one or more of the defendants.  As a

11  result of defendants' unlawful conduct alleged herein, Martin has paid at least one excessive and

12  illegal Penalty Fee in the four years preceding the filing of this Complaint.

13        19.    Plaintiff Celeste Brackley ("Brackley") is a resident of the State of California, County

14  of San Diego.  Plaintiff Brackley has used a credit card issued by one or more of the defendants.  As

15  a result of defendants' unlawful conduct alleged herein, Brackley has paid at least one excessive and

16  illegal Penalty Fee in the four years preceding the filing of this Complaint.

17        20.    Plaintiff Marilyn Foster-Nemec ("Foster-Nemec") is a resident of the State of

18  California, County of Alameda.  Plaintiff Foster-Nemec has used a credit card issued by one or more

19  of the defendants.  As a result of defendants' unlawful conduct alleged herein, Foster-Nemec has

20  paid at least one excessive and illegal Penalty Fee in the four years preceding the filing of this

21  Complaint.

22        21.    Plaintiff Aaron González ("González") is a resident of the State of California, County

23  of San Diego.  Plaintiff González has used a credit card issued by one or more of the defendants.  As

24  a result of defendants' unlawful conduct alleged herein, González has paid at least one excessive and

25  illegal Penalty Fee in the four years preceding the filing of this Complaint.

26        22.    Plaintiff Elizabeth Young ("Young") is a resident of the State of California, County

27  of Los Angeles.  Plaintiff Young has used a credit card issued by one or more of the defendants.  As

28

1   a result of defendants' unlawful conduct alleged herein, Young has paid at least one excessive and

2   illegal Penalty Fee in the four years preceding the filing of this Complaint.

3           23.     Piñon, B. Simm, C. Simm, Shaw, Halasz, Brotman, Martin, Brackley, Foster-Nemec,

4   González and Young are collectively referred to herein as "plaintiffs."  The existence, imposition

5   and price of late fees and over-limit fees is material to all plaintiffs and class members.

6   **The Bank of America Defendants**

7           24.     Defendant Bank of America, N.A. is a national banking association with its principal

8   place of business in Charlotte, North Carolina.  Bank of America, N.A. is an issuing bank that,

9   throughout this judicial district, issues credit cards to individuals and businesses.  Bank of America,

10  N.A. is a wholly owned subsidiary of N.B. Holdings, which in turn is a wholly owned by defendant

11  Bank of America Corporation, a Delaware corporation with its principal place of business in

12  Charlotte, North Carolina.  In January 2006, Bank of America Corporation acquired 100% of the

13  stock of MBNA America Bank, N.A. ("MBNA").  It knowingly imposed late fees and over-limit

14  fees as high as $39 and had actual knowledge of, and has knowingly participated in, the conspiracies

15  alleged in this Complaint.

16          25.     Defendant Bank of America, N.A., defendant Bank of America Corporation, N.B.

17  Holdings and MBNA are referred to collectively as "Bank of America."  Ranked by outstandings,

18  Bank of America is the largest issuer of Visa- and MasterCard-branded credit cards in the United

19  States.

20  **The Capital One Defendants**

21          26.     Capital One Bank, a Virginia bank with its principal place of business in Glen Allen,

22  Virginia, and Capital One F.S.B., a national bank with its principal place of business in McLean,

23  Virginia, are wholly-owned subsidiaries of defendant Capital One Financial Corporation, a Delaware

24  corporation with its principal place of business in McLean, Virginia.  Defendant Capital One

25  Financial Corporation, Capital One Bank and Capital One F.S.B. are collectively referred to as

26  "Capital One."

27          27.     Capital One is an issuing bank that, throughout this judicial district, issues credit

28  cards to individuals and businesses.  It knowingly imposed late fees as high as $39 and over-limit

1   fees as high as $29 and had actual knowledge of, and has knowingly participated in, the conspiracies

2   alleged in this Complaint.  Ranked by outstandings, Capital One is the fourth largest issuer of Visa-

3   and MasterCard-branded credit cards in the United States.

4   **The Chase Defendants**

5         28.   Defendant Chase Bank USA, N.A., a New York bank with its principal place of

6   business in New York, New York, is the successor to Chase Manhattan Bank USA, N.A., and a

7   wholly-owned subsidiary of defendant JPMorgan Chase & Co., a Delaware corporation with its

8   principal place of business in New York, New York.  In 2004, JP Morgan Chase & Co. completed its

9   acquisition of Bank One Corporation and Bank One, Delaware, N.A.  Defendants Chase Bank USA,

10  N.A. and JP Morgan Chase & Co., and Chase Manhattan Bank USA, N.A., Bank One Corporation,

11  and Bank One, Delaware, N.A. are referred to collectively herein as "Chase."

12        29.   Chase is an issuing bank that issues credit cards to individuals and businesses

13  throughout this judicial district.  It knowingly imposed late fees and over-limit fees as high as $39

14  and had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this

15  Complaint.  Ranked by outstandings, defendant Chase is the second largest issuer of Visa- and

16  MasterCard-branded credit cards in the United States.

17  **The Citigroup Defendants**

18        30.   Defendant Citibank South Dakota, N.A., a bank with its principal place of business in

19  New York, New York, is a subsidiary of defendant Citigroup, Inc., a Delaware corporation with its

20  principal place of business in New York, New York.  Citicorp merged into defendant Citigroup, Inc.,

21  on August 1, 2005.  Defendant Citibank South Dakota, N.A., Citicorp, and defendant Citigroup, Inc.

22  are collectively referred to herein as "Citigroup."

23        31.   Citigroup is an issuing bank that, throughout this judicial district, issues credit cards

24  to individuals and businesses.  It knowingly imposed late fees and over-limit fees as high as $39 and

25  had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this

26  Complaint.  Ranked by outstandings, Citigroup is the third largest issuer of Visa- and MasterCard-

27  branded cards in the United States.

28

**The Washington Mutual Defendants**

32.    Defendant Washington Mutual Bank is a Washington State chartered corporation with its principal place of business in Seattle, Washington.  In October 2005, Washington Mutual Bank completed its acquisition of Providian.  Defendant Washington Mutual Bank and Providian are collectively referred to as "WMB."  WMB does business throughout the State of Washington and in many other states in the country.  WMB's business includes extending credit to individuals and businesses through loans, lines of credit, and credit cards.  WMB knowingly imposed late fees as high as $39 and over-limit fees as high as $35 and had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint.  Ranked by outstandings, WMB is the sixth largest issuer of Visa- and MasterCard-branded credit cards in the United States.

33.    Defendant Washington Mutual, Inc. (collectively with WMB, "WAMU"), is a savings and loan holding company with its principal place of business in Seattle, Washington. Washington Mutual, Inc. does business throughout the State of Washington and in every other state in the country, as well as in the District of Columbia.  Defendants WMB, Providian and Washington Mutual, Inc. are collectively referred to herein as "WAMU."

**The Wells Fargo Defendants**

34.    Defendant Wells Fargo & Company ("Wells Fargo") is a Delaware corporation with its principal place of business in San Francisco, California.  Wells Fargo & Company is an issuing bank that, throughout this judicial district, issues credit cards through its wholly-owned subsidiaries Wells Fargo Bank, N.A., Wells Fargo Financial Bank and Wells Fargo Financial National Bank to individuals and businesses.  Defendants Wells Fargo & Company, Wells Fargo Bank, N.A., Wells Fargo Financial Bank and Wells Fargo Financial National Bank are collectively referred to as "Wells Fargo."  Wells Fargo knowingly imposed late fees and over-limit fees as high as $35 and had actual knowledge of, and has knowingly participated in, the conspiracies alleged in this Complaint. Ranked by outstandings, Wells Fargo is the seventh largest issuer of Visa- and MasterCard-branded credit cards in the United States.

35.    Defendants Bank of America, Capital One, Chase, Citigroup, Washington Mutual and Wells Fargo are referred to here collectively as "defendants."

## CO-CONSPIRATORS

36.     Various other persons, firms, corporations, organizations, and other business entities, some unknown and others known, not joined as defendants in this Complaint or identified as co-conspirators herein, have also participated as co-conspirators in the violations alleged and have performed acts and made statements in furtherance thereof.  Co-conspirators include, but are not limited to, the following: financial institutions that issue credit cards, payment industry media, third-party processors such as First Data Resources ("FDR") and Total Systems Services, Inc. ("TSYS") that process payment card transactions, credit card industry consultants, trade associations such as the American Bankers Association, and the two major credit card networks, Visa U.S.A. ("Visa") and MasterCard International, Inc. ("MasterCard").

37.     At all times herein mentioned, each and every defendant and co-conspirator was an agent of each and every other defendant and co-conspirator.  Each of the defendants conspired with and aided and abetted the commission of unlawful, unfair and deceptive business practices by their co-defendants or co-conspirators.  Defendants and co-conspirators were aware, or should have been aware, that the imposition of excessive Penalty Fees was unlawful, unfair and deceptive as alleged herein.  By facilitating the imposition, terms and pricing of Penalty Fees, defendants and their co-conspirators substantially assisted and/or encouraged their co-defendants and co-conspirators in the commission of the unlawful, unfair and deceptive practices alleged herein.

## CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action pursuant to Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent the following classes:

39.     ***Nationwide Injunctive Relief Class***: All holders of credit cards (excluding federal, state and local governmental entities, defendants, their directors, officers and members of their families) issued by defendants Bank of America, Capital One, Chase, Citigroup, Washington Mutual and Wells Fargo.

40.     ***Nationwide Damages Classes***

(a)     ***Nationwide Late Fee Damages Class***: All holders of credit cards issued by defendants Bank of America, Capital One, Chase, Citigroup, Washington Mutual and Wells Fargo

1    (excluding federal, state and local governmental entities, defendants, their directors, officers and

2    members of their families) who have been charged a late fee from January 31, 2003 through the trial

3    of this matter (the "Class Period").

4              (b)    ***Nationwide Over-Limit Fee Damages Class***:  All holders of credit cards

5    issued by defendants Bank of America, Capital One, Chase, Citigroup and Washington Mutual

6    (excluding federal, state and local governmental entities, defendants, their directors, officers and

7    members of their families) who have been charged an over-limit fee during the Class Period.

8    41.    ***California Classes***

9              (a)    ***California Late Fees Class***: All holders of credit cards in California issued by

10   defendants Bank of America, Capital One, Chase, Citigroup, Washington Mutual and Wells Fargo

11   (excluding federal, state and local governmental entities, defendants, their directors, officers and

12   members of their families) who have been charged a late fee during the Class Period.

13             (b)    ***California Over-Limit Fee Class***: All holders of credit cards in California

14   issued by defendants Bank of America, Capital One, Chase, Citigroup and Washington Mutual

15   (excluding federal, state and local governmental entities, defendants, their directors, officers and

16   members of their families) who have been charged an over-limit fee during the Class Period.

17   42.    The members of the classes are so numerous and geographically dispersed that

18   joinder of all class members in this action is impracticable.

19   43.    Plaintiffs' claims are typical of the claims of the members of the classes, because

20   plaintiffs and all members of the classes were damaged by the same wrongful conduct of the

21   defendants, and will continue to be so damaged and/or are threatened with such damage in the

22   absence of injunctive relief, and defendants have acted on grounds generally applicable to the

23   classes.

24   44.    Plaintiffs will fairly and adequately protect the interests of the classes.  The interests

25   of plaintiffs are coincident with, and not antagonistic to, those of the classes.  In addition, plaintiffs

26   are represented by counsel who are experienced and competent in the prosecution of complex class

27   action antitrust and consumer litigation, including complex class actions involving credit card

28   corporations and financial institutions.

45.     Questions of law and fact are common to the members of the classes and the defendants and their co-conspirators have acted on grounds generally applicable to all members of the classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the classes as a whole.  Among the questions of law and fact common to the classes are:

(a)     Whether late fees imposed by defendants constitute penalties and/or punitive damages for breach of contract;

(b)     Whether over-limit fees imposed by defendants constitute penalties and/or punitive damages for breach of contract;

(c)     Whether the various federal and state statutes and regulations that purportedly authorize the imposition of Penalty Fees as contractual punitive damages must be interpreted to comply with substantive due process requirements;

(d)     Whether the Penalty Fees defendants imposed during the Class Period exceed the levels allowed by the statutes and regulations as constitutionally interpreted;

(e)     Whether if those relevant statutes and regulations are not susceptible to an interpretation that is consistent with due process requirements, they must be invalidated as unconstitutional and the common law ban on punitive damages must be reinstated;

(f)     Whether defendants charged members of the classes late fees that constituted unlawful, deceptive and/or unfair punitive damages for breach of contract in violation of statutes and common law including the NBA, DIDA, the UCL and the CLRA;

(g)     Whether defendants charged members of the classes over-limit fees that constituted unlawful, deceptive and/or unfair punitive damages for breach of contract in violation of statutes and common law including the NBA, DIDA, the UCL and the CLRA;

(h)     Whether the defendants and their co-conspirators engaged in a contract, combination, or conspiracy to restrain competition over the terms and pricing of late fees;

(i)     The duration and extent of the contract, combination or conspiracy;

(j)     The mechanisms used to accomplish the contract, combination or conspiracy;

1              (k)      Whether the defendants and their co-conspirators violated §1 of the Sherman

2   Act and the Cartwright Act;

3              (l)      Whether members of the classes are threatened with continuing harm from the

4   violations of federal and state statutes and common law as alleged herein; and

5              (m)      Whether defendants unjustly enriched themselves.

6       46.    The defendants have acted and continue to act on grounds generally applicable to the

7   classes, thereby making appropriate final injunctive relief or corresponding declaratory relief with

8   respect to the classes as a whole.

9       47.    Class action treatment is superior to the alternatives, if any, for the fair and efficient

10  adjudication of the controversy.

11      48.    Plaintiffs know of no unusual difficulties that are likely to be encountered in the

12  management of this action that would preclude its maintenance as a class action.

13                        **BACKGROUND: THE CREDIT CARD MARKET**

14      49.    Credit cards, like Visa- and MasterCard-branded cards, are payment devices that a

15  consumer can use to make purchases through a revolving line of credit, the terms of which are set by

16  the card issuer.   Visa- and MasterCard-branded cards are issued by banks or their affiliates.

17  Consumers can make credit card purchases from unrelated merchants without accessing or reserving

18  the consumer's funds at the time of the purchase.

19      50.    Credit cards provide the cardholder the option of: (i) paying all charges within a set

20  period after a monthly bill is presented; or (ii) paying only a portion of the charge within that time

21  and paying the remainder in monthly installments plus a finance or interest charge.

22      51.    Visa and MasterCard (the "networks") each own and operate open credit card

23  networks through which their respective member banks (*i.e.*, issuing banks or issuers) can issue

24  credit cards to cardholders under licensing agreements with Visa or MasterCard.   Among other

25  things, Visa and MasterCard: (i) implement systems and technologies to authorize, clear, and settle

26  credit card transactions; (ii) market and promote their brand names; (iii) develop and impose rules;

27  and (iv) assess fees on their member banks.   These activities are principally financed through fees

28  and assessments levied on their members, including defendants.

1    52.    In addition, merchants contract with Visa and MasterCard member banks ("acquiring

2    banks" or "acquirers") to accept their cards.  The cardholder accounts are owned by the issuing

3    banks and transactions are processed by the banks themselves, or by third-party processors such as

4    FDR or TSYS.  FDR and/or TSYS provide processing services for each defendant.  The services

5    processors provide are typically receiving authorization and clearing data from Visa's and

6    MasterCard's systems, housing cardholder account information, generating and mailing monthly

7    statements, calculating cardholder charges and fees, producing and mailing plastic cards, providing

8    customer services in the issuer's name to cardholders, and providing reporting to the banks on their

9    card portfolios.

10    53.    In a typical credit card transaction on the Visa or MasterCard networks, a merchant

11    accepts a credit card from a customer for the provision of goods and services.  The merchant swipes

12    the card.  The information is transmitted to the bank that issued the card for authorization. After the

13    issuing bank electronically authorizes the transaction, the merchant submits the Visa or MasterCard

14    card transaction to his acquiring bank.  The acquirer remits the transaction to the network for

15    clearing and settlement, and pays the merchant less an amount known as the merchant discount.

16    Clearing is the movement of data that describes the transaction from the acquirer to the issuer, and

17    settlement is the movement of funds by the networks between the issuer and the acquirer.  The

18    networks receive and route transactions to the issuers or their designated processors.  The networks

19    then report the issuer and acquirer settlement positions, and remit the amounts owed to the acquirers

20    from the issuers less the interchange amount owed to the issuers.  The issuers bill the cardholders.

21    The foregoing is generally accomplished electronically through the networks' clearing and

22    processing systems or those of a third-party processor.

23                            **RELEVANT MARKET**

24    54.    The relevant market is no broader than the market for credit cards issued by U.S.

25    financial institutions.  Credit cards are a separate market from other forms of payment, such as cash,

26    checks and debit cards for a variety of reasons, including that: (i) credit cards are considered safer

27    than carrying large amounts of cash; (ii) credit cards are more widely accepted than checks;

28

1   (iii) credit cards offer a credit function that debit cards do not and thus forms of payment such as

2   cash, checks and debit cards are not a close substitute for a credit card.

3        55.    Credit cards occupy a unique position in today's economy in that they are a practical

4   necessity for most consumers to rent a car, reserve a hotel, buy airline tickets, engage in Internet

5   commerce and secure numerous other services and products.  Many consumers view credit cards as

6   an indispensable part of every day life.  Cardholders in the United States each have an average of

7   4.95 credit cards and there are approximately 464 million credit card accounts in the United States.

8        56.    Other forms of payment such as cash, checks and debit cards are not readily

9   interchangeable with credit cards by virtue of the credit function that allows a cardholder to make

10  purchases worth more than the balance they have in a deposit account and to delay payment for a

11  specific period of time.  *See United States v. Visa U.S.A., Inc.*, 163 F. Supp. 2d 322 (S.D.N.Y. 2001),

12  *aff'd*, 344 F.3d 229 (2d Cir. 2003).  The trial court in that case ruled that "defendants' [Visa and

13  MasterCard] own admissions and evidence of consumer preferences support . . . and demonstrate the

14  existence of a general purpose card market separate from other forms of payment." *Id.* at 336.  The

15  court also explained that "consumers strongly prefer to use credit and charge cards rather than cash

16  or checks, because they generally do not want to carry large sums of cash to make large purchases,

17  and checks generally have much lower merchant acceptance than either cash or general purpose

18  cards. . . .  Also, consumers benefit from the general purpose card's credit function, which allows for

19  the choice to purchase now and pay later." *Id.*  Accordingly, the court held that "because card

20  consumers have very little sensitivity to price increases in the card market and because neither

21  consumers nor the defendants view debit, cash and checks as reasonably interchangeable with credit

22  cards, general purpose cards constitute a product market." *Id.* at 338.  The Second Circuit upheld the

23  trial court's ruling that credit cards constitute a separate and relevant market.  *United States v. Visa*

24  *U.S.A., Inc.*, 344 F.3d 229, 239 (2d Cir. 2003).

25       57.    The geographic market is the market for credit cards in the United States.

26       58.    Defendants' combined market share of the United States credit card market exceeds

27  65% as of 2006, and defendants collectively exercise market power.

28

CONSOLIDATED COMPLAINT                    No. C-07-0634-SBA        -14-

**TRADE AND COMMERCE**

59.     The activities of the defendants and their co-conspirators, as described in this Complaint, took place within interstate commerce, had and continue to have a substantial effect on interstate trade and commerce and have unreasonably restrained, and continue to restrain, interstate trade and commerce.  The acts complained of in this Complaint have harmed the business and property of plaintiffs and members of the classes and present a continued threat of loss and damage to plaintiffs and the members of the classes.

**FACTUAL ALLEGATIONS**

60.     The defendants' credit card contracts, with minor irrelevant variations, state that monthly payments must be made by the due date printed on the billing statement, or for electronic payors, displayed on the issuer's website.  These agreements also limit the amount of credit available to the cardholder.

61.     For the first few decades after credit cards were introduced in the 1950s, issuers commonly charged a single fixed interest rate of around 20% as the annual percentage rate ("APR") that covered most of an issuer's expenses associated with card use.  By 1980, issuers also charged cardholders an annual fee of $20 to $50.  Generally, credit cards were only offered to the most credit worthy U.S. consumers.  In the late 1980s and early 1990s, few issuers charged Penalty Fees for making late payments or exceeding the credit limit set by the issuer.  When such Penalty Fees were assessed, they were relatively small.  For example, the typical late fee in the 1980s ranged from just $5 to $10.  This is not surprising because their costs from late payment or exceeding one's credit limit are *de minimis*; penalties or punitive damages for breach of contract were generally unenforceable under common and state law.

62.     In the period from 1990 through 2004 interest rates declined substantially.  This decline and competition over interest rates and annual fees resulted in lower credit card interest rates and the reduction or even elimination of annual fees on many credit cards.  To offset the resultant decline in revenue, issuers made an "end run" around the prohibition on contractual punitive damages in order to increase Penalty Fee revenue.  In 1995, the banking and payment card industry successfully lobbied the Comptroller of the Currency to issue a regulation interpreting §85 of the

1  NBA to permit nationally chartered bank issuers to charge customers in any state whatever late and

2  over-limit fees are permitted in the bank's home state. *See* 12 U.S.C. §85 and 12 C.F.R. §7.4001.

3  The banking and payment card industry had previously lobbied certain state legislatures to allow

4  issuers located in their states to impose unlimited Penalty Fees. The 1995 regulation along with the

5  laws of the banks' home states appeared to allow issuers to impose excessive and even unlimited

6  punitive fees for late fees and over-limit fees.

7  **The Rise in Late Fees**

8       63.    After this regulation went into effect, issuers made sure to locate their credit card

9  operations in the states purportedly allowing excessive and even unlimited Penalty Fees. The issuers

10  then increased their late fees and over-limit fees dramatically. By 1998, cardholder fee income had

11  grown by nearly 160%, from $7.3 billion in 1994 to $18.9 billion in 1998. Between 1994 and 1999,

12  Penalty Fees doubled in actual dollar averages. Late fees were the driving force in the issuers'

13  increased fee income. By mid-1999, more than 90% of the industry was charging late fees, and 85%

14  of the industry was charging over-limit fees.

15       64.    Between 1995 and 2000, late fees rose 104%. Between 2000 and 2006, late fees rose

16  another 27%. Defendants' late fees in this period were priced within $5 of each other. By 2005, late

17  fees had risen from an average of $11.71 in 1994 to $34.42 in 2006, an increase of over 193%. Six

18  of the nation's top 10 issuers charged up to a $39 late fee in 2006.

19       65.    In 2006, issuers earned roughly $79 billion from late fees and interest charges. The

20  fees were likened to "a hidden tax on card holders" during the Senate Committee on Banking

21  hearing on the credit card industry on January 25, 2007.

22  **The Rise in Over-Limit Fees**

23       66.    Over-limit fees are imposed when consumers exceed the credit limit set forth in the

24  credit agreement.  In the mid 1990s, issuers typically assessed an over-limit fee only if the

25  cardholder exceeded the credit line by 5%-10%. And most issuers would only assess an over-limit

26  fee if the closing balance for the month was above the credit line. But by 2005, top issuers such as

27  defendants MBNA and Chase were charging fees for exceeding the credit limit at ***any*** time during

28  the billing cycle. Moreover, finance charges added to an account after the close of the current billing

1   cycle can cause an over-limit status, even if the minimum payment has already been posted.  Not

2   surprisingly, instances where defendant issuers are not charging over-limit fees are on portfolios

3   marketed to affluent cardholders with high credit limits and who can most afford to pay over-limit

4   fees.  Because defendants have not charged over limit fees on certain portfolios, the percentage of

5   accounts subject to over-limit fees decreased slightly between 2003 and 2005, while the price of the

6   over-limit fee imposed on less affluent accounts has soared to outrageous levels.

7        67.    Since June 1993, over-limit fees have soared by over 150%.  In the five years

8   between 1994 and 1999, average over-limit fees grew 96%, from $12.75 to $24.96.  Between 1998

9   and 2003, over-limit fees increased 52%, from an average of $18.59 to $28.21.  Between 2001 and

10  2004, over-limit fees increased 17%.  By 2005, the most common over-limit fee among major

11  issuers was up to $35, some issuers were already charging up to $39 on accounts with higher

12  balances.

13                  **THE CURRENT LEVEL OF PENALTY FEES IS UNLAWFUL**

14       68.    Penalty Fees are a form of punitive damages imposed for breaches of the cardholders'

15  contractual obligation to make payments by a certain date or stay within contractual credit limits.

16       69.    There is no legitimate business justification or cost basis for the level of over-limit

17  fees or late fees defendants charge.  They are virtually pure profit for the defendants.  Purported cost

18  justifications for Penalty Fees include the cost of funds for late payment, cardholder default and

19  administration relating to collections.  However, each of these purported costs is captured by the

20  interchange fee the issuers collect on each transaction, and through interest rates and finance charges

21  imposed on the entire balance due, even though cardholders are late only on remitting a smaller,

22  minimum payment.  Moreover, late payers tend to be charged higher interest rates, called "penalty

23  rates," on their entire balances.  A penalty rate may exceed 30% and generate substantial additional

24  revenues from late payments.

25       70.    Late fees therefore represent double dipping by the issuers, because cardholders

26  already pay interest on balances not paid in full by the due date.  Issuers that dramatically increase

27  interest rates as punishment for late payment engage in ***triple*** dipping.  An over-limit fee resulting in

28  part from assessed late fees and interest charges is the ***quadruple dip***.  To illustrate this quadruple

1   dipping: for a $100 balance with 29% interest plus a $39 late fee, the real rate of interest is 68%.

2   Adding a $39 over-limit fee, and the effective rate of interest jumps to over 107%.  Hit the

3   cardholder with compound interest on the fee and with over-limit fees two or three months in a row,

4   the effective interest rate could swell to over 350% or higher.

5       71.    Issuers conduct their business as though the NBA, DIDA, their regulations, and state

6   statutes give them discretion to impose unlimited punitive damages for breaches of credit card

7   agreements.  In 2003, however, the United States Supreme Court held that the U.S. Constitution's

8   Due Process Clause strictly limits punitive damages. *State Farm*, 538 U.S. at 425.  To the extent the

9   NBA and DIDA allow Penalty Fees for breaches of contract, the statutes must be interpreted to

10  comport with due process principles.  At most, these would permit late fee charges of nine times

11  actual damages.  If the NBA and DIDA cannot be construed to reflect this constitutional principle

12  and may only be interpreted as permitting the enforcement of limitless punitive penalty charges, it is

13  perforce unconstitutional.  Yet, defendants have knowingly imposed late fees and over-limit fees of

14  up to $39.  The late fees and over-limit fees they impose vastly exceed what the NBA, DIDA and

15  state laws would allow when interpreted to comply with substantive due process limits.  These

16  overcharges also violate California's UCL and CLRA and permit defendants to unjustly enrich

17  themselves.  Thus, defendants' Penalty Fees constitute illegal overcharging of consumers in

18  violation of the NBA and DIDA.

19  **The Conspiracy to Fix and Maintain Disproportionately High Late Fees**

20      72.    Defendants and their co-conspirators have combined, conspired and contracted to

21  adopt, implement and maintain late fees at supra-competitive levels.

22      73.    In the past, credit card issuers made most of their profits from interest and annual

23  fees.  In the late 1980s, the major credit card issuers charged interest rates of 17%-20%.  During this

24  time the major credit card issuers all charged an annual fee.

25      74.    In 1990, AT&T launched the Universal Card credit products, which had the feature of

26  no annual fees.  This was followed in 1992 by Household Financial Services' (now HSBC) GM

27  Card with no annual fee and a 5% purchase earning credit toward the purchase of GM vehicles.

28

1   Faced with such competition, issuers gradually eliminated annual fees on standard non-reward cards

2   and introduced reward and affinity programs.

3   75.   Interest rates in general continued to decline in the early 1990s, due in part to

4   increased interest rate competition among the issuers.  This, combined with the changes wrought by

5   new market entrants, resulted in historically low credit card interest rates.  Between 1990 and 2004,

6   the average APR dropped from over 18% to just over 12%.

7   76.   Consequently, issuers' revenue from interest and annual fees as a percentage of total

8   revenue has fallen dramatically.  While interest income accounted for about 75% of issuers' revenue

9   in 1991, it dropped to about 60% of issuers' revenue in 2003.  The percentage of income that issuers

10   derive from annual fees has also declined precipitously.

11   77.   As those two big revenue streams shrank, issuers found other revenue sources by

12   introducing and/or increasing "ancillary" sources of income.  Between 1996 and 2003, late fee

13   revenues soared from $1.7 billion to $7.3 billion.  In 2005 the top six issuers reported assessing a

14   total of $7.4 billion in late fees and over-limit fees, for an average of $1.2 billion each.

15   78.   Unlike annual fees, interest rates, and card attributes (*e.g.*, reward programs) where

16   defendants competed and prices varied widely (and depending upon the issuer dropped over time)

17   there has been little to no price competition with regard to late fees.  In fact, defendants have been

18   able to set a price floor and impose price uniformity, as they ratchet up late fees and monitor to

19   enforce this uniformity, over a period of years.

20   79.   Each defendant had a motive to conspire to impose and maintain supra-competitively

21   priced late fees.  Because defendants have faced competition within the credit card industry on

22   interest rates and annual fees charged to cardholders, defendants have increasingly relied on late fees

23   as a source of income.  In contrast to over-limit fees, which are not charged on certain portfolios,

24   including those aimed at affluent cardholders and frequent travelers, late fees are almost universally

25   imposed across card portfolios and products.  Defendants knew, however, that late fees can also be

26   subject to competition and price pressure because the industry saw that annual fees have been

27   competed away almost entirely.  Accordingly, defendants had a strong incentive to restrain

28   competition over imposition of the terms and pricing of late fees.

1    80.    Defendants began communicating with each other and their co-conspirators

2    concerning the imposition, pricing, enforcement, marketing and collection of late fees through:

3    (i) meetings facilitated by their membership and participation in industry trade shows and trade

4    groups; (ii) meetings and symposia hosted by third-party processors; (iii) the networks, including

5    board membership and participation in, among other activities, committees, subcommittees and

6    advisory panels; (iv) use of common payment industry consultants; and/or (v) use of common third-

7    party processors.  Indeed, all the major issuers have participated in numerous meetings sponsored by

8    the networks, third-party processors, trade groups and/or consultants, that actually set aside time for

9    peer-to-peer exchanges, *i.e.*, dedicated meetings of horizontal competitors that facilitated

10   communication about the pricing and terms of late fees.

11   81.    Defendants have ample opportunities to communicate among themselves about the

12   pricing and terms of late fees, through trade organizations, consultants, the networks and third-party

13   processors.  During various meetings among the defendants facilitated by consultants, trade

14   associations, third-party processors, and through membership on network boards, committees,

15   subcommittees and advisory panels, defendants had the opportunity to and, upon information and

16   belief, did explore the possibility of adopting uniform criteria for imposing and pricing late fees.

17   The terms and prices of late fees ultimately implemented and agreed upon by defendants are

18   materially identical.  Defendants have increased late fees at or about the same time by about the

19   same amounts, adopting methodologically identical or nearly identical terms.  Any differences in the

20   price and terms of late fees are immaterial to the ultimate purpose of the conspiracy: to impose late

21   fees at identical or nearly identical prices and terms thus insuring a steady stream of revenues and

22   high profit margins from these fees without the risk of competition breaking out as happened with

23   annual fees and other price and non-price terms of credit cards.

24   82.    By 1997, there was only slight variation in the terms and amount of late fees imposed

25   by the defendant issuers.  The defendants moved in lock-step as they increased the amount of late

26   fees.  By spring of 2001, nine of the top 10 issuers charged a $29 late fee.  By April 2004, the

27   average late fee charged by the top 10 issuers had risen to $36.50.

28

CONSOLIDATED COMPLAINT                        No. C-07-0634-SBA          -20-

83.     Defendant issuers also changed how and when late fees are assessed.  In the early 1990s, most issuers would only assess a late fee if the account was more than 30 days past due.  For example, in the mid-1990s, Citigroup charged a $15 late fee for every 15 days past the due date. Today, defendant issuers impose a late fee for being just one day past due.  Grace periods have also shrunk, from 25-30 days to 10 days and even one day.

84.     In 2001 and 2002, defendants Citigroup, Chase, Wells Fargo and Bank of America all introduced a virtually identical three-tier late fee billing structure, where the amount of the fee was determined by the cardholder's average balance.  They did so through a third party processor system (defendants Citigroup, Chase and Wells Fargo employed FDR for processing their credit card portfolios in the 2001- 2002 timeframe, while Bank of America used TSYS).  Processing companies usually add new billing features to their systems at the request of one or more of their bank clients. By 2004, defendants Capital One (which uses TSYS) and Washington Mutual (which used TSYS and FDR) had implemented tiered late fees as well.

85.     In 2001, Citigroup boosted its late fees from $29 to $35 on past due balances over $1000, $25 for balances between $100 and $1000, and $15 for balances under $100.   Soon thereafter, MBNA implemented the same structure and late fees as Citigroup.

86.     At present, defendants, which together control over 70% of the U.S. credit card market, charge similarly or identically tiered late fees.

The following table shows each defendant's current tiering structure:

| Current Late Fees Tiering by Issuer | | | |
|---|---|---|---|
| Issuer | Tier 1 | Tier 2 | Tier 3 |
| Bank of America * | $15 | $29 | $39 |
| MBNA * | $15 | $29 | $39 |
| Chase * | $15 | $29 | $39 |
| Citigroup * | $15 | $29 | $39 |
| Wells Fargo ** | $20 | $29 | $35 |
| Capital One † | | $29 | $39 |

| Current Late Fees Tiering by Issuer | | | |
|---|---|---|---|
| **Issuer** | **Tier 1** | **Tier 2** | **Tier 3** |
| Washington Mutual †† | $19 | - | $39 |

(*) Tier 1 applies to past due minimum payments on balances up to $100; Tier 2 applies to past due minimum payments on balances of $100 to $250; Tier 3 applies to past due minimum payments on balances over $250.

(**) Wells Fargo tier 2 fee applies to past due minimum payments for balances between $100 and $1,000.

(†) Capital One imposes a two-tier fee structure, with a $29 late fee charged for past due minimum payments on balances under $1,000; and a $39 late fee for past due minimum payments on balances over $1,000.

(††) Washington Mutual imposes a two-tier fee structure, with a $19 late fee charged for past due minimum payments on balances under $200; and a $39 late fee for past due minimum payments on balances over $200.

87.     The tiered late fee billing structure used by defendants was facilitated and is implemented by third-party processors FDR and TSYS, which, amongst other things, provide cardholder accounting, billing calculation and statement mailing services.   Third-party card processors introduce cardholder billing system changes at the specific request of one or more of their bank clients.  In many cases, the requesting banks agree to pay the third-party processor fees for system development and testing for new features.  The processing companies created the tiered late fee billing structure and implemented it on their systems, then made the feature available to more than one issuer to use to bill cardholders.  Third party processor FDR was used by defendants Chase, Citibank and Wells Fargo, which all introduced the three-tiered late fee billing structure to cardholders in 2001 and 2002.  During that same time period, Bank of America, used third party processor TSYS to implement the same tiering structure. By 2004, Washington Mutual (both TSYS and FDR) – had implemented tiered fee billing structures as well.  Use of common third-party processors allowed defendants to stay apprised of, receive and share information about one another's late fee pricing structures.

88.     The payment industry purports to be "competitive" in the issuance of credit cards. Solicitations directed by defendants to cardholders tout low interest rates for balance transfers, cash advances, no annual fees and all manner of perks (frequent flyer miles, cash back and points toward

merchandise).  However, the advertising and promotions that the defendant issuers use to attract customers demonstrate that while defendants may compete on these terms, they do not compete with regard to late fees.  Defendants compete on the pricing front end (annual fees, APRs, rebates, rewards, etc.), but not on late fees.

89.     While issuers have significantly slashed interest rates and annual fees since 1992, they have not rolled back late fees or liberalized their late fee terms and policies.  In fact, late fees have risen dramatically since 1992.  In sum, the defendants have set and maintained a price floor for late fees which has steadily been ratcheted up as one or more of the defendants imposes an increase with the others following close behind.  Defendants have maintained this disciplined price maintenance over a number of years.  As the following table illustrates, late fees have climbed between 2001 and 2006, unabated by competition among defendant issuers in an otherwise purportedly competitive issuing market:

| Late Fees by Issuer | | |
|---|---|---|
| Issuer | 2001 | 2006 |
| Citigroup | $35 | $39 |
| MBNA | $29 | $39 |
| Chase | $29 | $39 |
| Capital One | $29 | $39 |
| B of A | $29 | $39 |
| Washington Mutual/Providian | $29 | $39 |
| Wells Fargo | $29 | $35 |

90.     The conspiracy to fix and maintain the terms and prices of late fees was facilitated by the unfair manner in which the fees were imposed and are maintained.  While defendants conspired to impose the late fees and not compete on pricing and terms, plaintiffs and other members of the classes did not affirmatively agree to accept them.  Changes to late fees were either engrafted onto existing cardholder agreements through change in terms notices or buried in the cardholder agreements.

91.     Defendants also presented late fees, as well as over-limit fees, as enforceable terms in their cardholder agreements and change-in-terms letters.  Defendants know that the pricing of late

1  fees and over-limit fees bears no relationship to any actual damages sustained as a result of late

2  payment or exceeding prescribed credit limits, and that the pricing exceeded permissible amounts

3  under the NBA interpreted consistent with constitutional limits on punitive damages set by *State*

4  *Farm*.  However, defendants continue to represent to cardholders that the terms and conditions of

5  late fees and over-limit fees were legal and enforceable.

6       92.     To the extent written information concerning late fees and over-limit fees – including

7  their purported enforceability – is presented to cardholders in agreements and changes of term

8  notices, it is done at a level too difficult for even a college educated consumer to understand.  This

9  facilitated defendants' conspiracy to fix and maintain the prices of late fees.  In addition, design

10 features such as text placement and font sizes do not conform to guidelines for creating easily

11 readable documents.   Contrary to usability and readability best practices, defendants conceal

12 important information in text, fail to group and label related material, and use small typefaces.

13 Edward Yingling, president of the American Bankers Association – which counts among its most

14 influential members defendants Citigroup and Chase and MBNA – admitted cardholders have

15 difficulty understanding fee forms and contracts.  When asked during a 2004 interview whether he

16 understands the contract sent to him with his credit card, he stated, "I think it would be very hard for

17 a lot of people to understand."  In response to the GAO 2006 report, Yingling also admitted that with

18 regard to issuers' delivery of information to consumers: "The disclosure system is not working well.

19 It needs to be fixed."  The GAO report recommended changes in disclosures to emphasize penalties.

20 The GAO report is based on, *inter alia*, the practices of defendants Citigroup, Chase, Bank of

21 America, Capital One and interviews with 112 cardholders.

22 **Effect of the Conspiracy**

23      93.     The purpose and effect of defendants' unlawful concerted conduct and conspiracy is

24 to inhibit competition and harm consumers, and benefit themselves, by fixing and maintaining late

25 fees at supra-competitive levels, which would not be imposed at such levels in the absence of

26 concerted activity.  The conspiracy also deprives plaintiffs and other members of the classes of any

27 meaningful choice concerning late fees and severely limits their ability to obtain a credit card that

28 does not contain late fees priced at supra-competitive levels.

1    94.    Without their knowledge or consent, consumers subject to the collusively set and

2    implemented late fees suffer increased costs of using their credit cards.  In addition to being set and

3    maintained at supra-competitive levels, late fees frequently cause consumers to incur additional fees,

4    such as over-limit fees and higher interest rates as they are simply lumped into a cardholder's unpaid

5    balance.  In addition, late fees impair the ability of cardholders to reduce their overall indebtedness.

6    Generally, any penalty charges that cardholders pay would consume funds that could have been used

7    to repay principal.

8    95.    Absent the conspiracy, most, if not all, of the defendants would not have imposed

9    materially identical late fees, but instead would have competed over the conditions, terms and

10   pricing of late fees given that the costs of late payment are *de minimis* and are more than recovered

11   through interest charges and other fees.  In a competitive market, and because consumers are attuned

12   to and care about the price of late fees, late fees would have been greatly reduced in price and certain

13   defendants would simply not have imposed them.

14                      **THE ARBITRATION CLAUSES FORCED ON THE**
                        **PLAINTIFFS ARE NOT ENFORCEABLE**
15

16   96.    Defendants have attempted to insulate their illegal and unfair business practices from

17   legal liability.  Each of the defendants include onerous, one-sided arbitration clauses in their

     cardholder agreements.  These arbitration clauses, imposed by parties of vastly superior bargaining
18
     power and resources into form contracts of adhesion known by the misnomer "cardholder
19
     agreements" are procedurally and substantively unconscionable and therefore unenforceable.
20
     Indeed, defendants insert the arbitration clauses into documents such as cardholder agreements or
21
     change in terms letters, which they know cardholders are unlikely to read or understand.
22
23   97.    Among other reasons, these arbitration clauses are unconscionable and unenforceable

24   because they require cardholders to forego the right to participate in a class action and/or class-wide

     arbitration.  Defendants understand that individual arbitrations do not provide fair procedures or
25
     unbiased forums for cardholders.  Defendants also know that collective action is the only practical
26
     means for cardholders, who have been injured in relatively small monetary amounts, to obtain
27
     redress of their grievances.  In an intentional and concerted effort to gain an unfair advantage over
28

CONSOLIDATED COMPLAINT                          No. C-07-0634-SBA            -25-

1   their cardholders and deny those cardholders the only practical means they have to challenge unfair

2   business practices, defendants have mounted an aggressive campaign to limit cardholder rights and

3   access to courts by the imposition of arbitration clauses that ban participation in class actions and/or

4   class-wide arbitrations.  This is the foremost weapon in their arsenal against their own cardholders

5   and defendants and their counsel meet regularly and plan ways to limit cardholders' practical access

6   to justice through participation in class actions.

7            98.      In addition, the arbitration clauses prevent plaintiffs from vindicating important

8   statutory rights.  For example, the various defendants' arbitration clauses do not provide for a

9   common arbitral forum.  In order for plaintiffs and the classes to be able to prosecute their claims in

10  this action, each of which is predicated on the conspiratorial conduct of the defendants, they must be

11  able to do so in a single forum.  It would be impossible, and economically irrational, for a single

12  cardholder to arbitrate in serial fashion in different arbitral forums antitrust cases against each of the

13  defendants when the conduct of each of the other defendants will be central to proving the elements

14  of a violation of the Cartwright Act.  Instead, plaintiffs must be able to present their case, against all

15  the defendants and their co-conspirators, in a single forum as they would in a court of law.  Serial

16  arbitrations against different defendants in different forums will increase, not decrease, the time and

17  expense required to resolve plaintiffs' claims and could lead to a number of inconsistent results.  The

18  arbitration clauses also deprive cardholders of an appeal from the arbitrator's ruling.  Instead, the

19  cardholder agreements require that all factual and legal issues be considered "anew" by a second

20  arbitration panel.  Requiring the factual and legal issues to be tried "anew" before different

21  arbitrators deprives plaintiffs of a fair and adequate mechanism for the vindication of plaintiffs'

22  rights because plaintiffs would face the identical risk, and prohibitive costs, in the new proceeding

23  instead of merely having the record reviewed by the appellate court.  These factors are contrary to

24  the view of state and federal appellate courts, including the Ninth Circuit, that arbitrations are valid

25  only so long as the arbitral system provides a prompt, neutral, and low cost alternative to litigation in

26  court.

27           99.      Another egregious provision, which must preclude enforcement, is the designation of

28  National Arbitration Forum ("NAF") as an arbitration administrator by six of the defendants.  Courts

1   have concluded that NAF arbitrations are biased and unfair because financial incentives would cause

2   NAF to favor financial institutions.  NAF is the exclusive arbitration administrator of MBNA, and it

3   is also designated as an arbitration administrator for Capital One, Chase, Citigroup and Providian.

4   This is not surprising because NAF solicits financial institutions and urges them to draft mandatory

5   arbitration clauses naming NAF as an arbitrator.  NAF's record on arbitration reveals an extreme

6   tendency to favor defendants, and NAF's activities are funded primarily through credit card

7   arbitrations.  In fact, NAF promotes itself as the alternative to the million dollar lawsuit and assures

8   banking institutions it will make a positive impact on the bottom line.  NAF explains its ban on class

9   actions is a benefit to financial institutions and acknowledges that consumers are unlikely to agree to

10  arbitration after a dispute arises.  That is because in their view there is no reason for a bank to be

11  exposed to the costs and risks of the jury system.  To this end, NAF purposely eliminates or

12  blackballs arbitrators who do not rule in favor of financial institutions.  In sum, the NAF acts as

13  virtual alter ego of the defendants by providing unfair and biased arbitral forums, and it is complicit

14  in their goal to deny their own cardholders access to justice.

15                              **FRAUDULENT CONCEALMENT**

16          100.    Throughout the conspiracy, defendants and their co-conspirators affirmatively,

17  actively and intentionally concealed the unlawful conduct alleged herein from plaintiffs and the

18  classes.  Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly

19  within the confines of their high-level executives.  Defendants and their co-conspirators conducted

20  their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance

21  thereof, and actively concealed their activities through various other means and methods to avoid

22  detection.  Plaintiffs did not discover, and could not have discovered through the exercise of

23  reasonable diligence, that defendants and their co-conspirators were violating the antitrust laws as

24  alleged herein until shortly before this class action was commenced.

25          101.    As a result of the active concealment of the conspiracy by defendants and their co-

26  conspirators, any and all applicable statutes of limitation otherwise applicable to the allegations

27  herein have been tolled.  Plaintiffs reserve the right to amend their allegations, including the Class

28

Period, once the origins of the conspiracy, including the approximate date of its inception, are brought to light.

## COUNT I

### For Charging Excessive Late Fees in Violation of the National Bank Act
### (12 U.S.C. §§85 and 86)

102.    Plaintiffs reallege and incorporate by reference the allegations set forth above on behalf of themselves, the Nationwide Injunctive Relief Class and the Nationwide Late Fee Damages Class.

103.    Defendants charge late fees in excess of what is authorized by the NBA.  The NBA authorizes the assessment of late fees in accord with the law of the state in which the issuer is chartered.  These late fees are punitive damages imposed on cardholders for breaches of contractual obligations.  Under principles of constitutional avoidance, the NBA must be interpreted to be consistent with constitutional strictures; otherwise, the relevant regulation and portion of the statute would have to be declared unconstitutional.  Therefore, it must be interpreted to authorize only the assessment of those punitive damages that comport with substantive due process.  Further, the NBA, properly interpreted, can only permit the exportation of those state statutes whose authorization of punitive late fees incorporates substantive due process limits.

104.    The exorbitant amount of late fees charged by defendants render them punitive damages that are excessively disproportionate to any losses suffered by defendants by a factor that exceeds the defendants' losses by no less than nine times.  They are, therefore, inconsistent with the substantive due process limits recognized by the United States Supreme Court in *State Farm*. Because the NBA must at least be interpreted to be consistent with constitutional limitations, it cannot authorize these unconstitutionally excessive punitive damages as legally enforceable. Therefore, these late fees are assessed outside the authority granted by the NBA in violations of 12 U.S.C. §§85 and 86.

105.    Defendants knowingly imposed punitive late fees for breaches of contract that exponentially exceeded any damages actually incurred.  As a result, defendants knowingly imposed late fees that are greater than what is allowed by §85 of the NBA.

106.    Accordingly, plaintiffs and members of the classes named in this Count are entitled to bring this claim and to recover herein restitutionary disgorgement, compensatory damages, punitive and/or special damages, reasonable attorneys' fees, costs, and other injunctive and declaratory relief as may be available, including the recovery of two times the amount of late fees charged during the statutory period.

**COUNT II**

**For Charging Excessive Over-limit Fees in Violation of the National Bank Act**
**(12 U.S.C. §§85 and 86)**

107.    Plaintiffs reallege and incorporate by reference the allegations set forth above on behalf of themselves, the Nationwide Injunctive Relief Class and the Nationwide Over-Limit Fee Damages Class.

108.    Defendants charge over-limit fees in excess of what is authorized by the NBA.  The NBA authorizes the assessment of over-limit fees in accord with the law of the state in which the issuer is chartered.  These over-limit fees are punitive damages imposed on cardholders for breach of contractual obligations.  But the NBA must be interpreted to be consistent with constitutional strictures.  Therefore, it must be interpreted to authorize only the assessment of those punitive damages that comport with substantive due process limitations.  Further, the NBA, properly interpreted, can only permit the exportation of those state statutes whose authorization of punitive over-limit fees incorporates substantive due process limits.

109.    The exorbitant size of over-limit fees charged by defendants render them punitive damages that are excessively disproportionate to any losses suffered by defendants by a factor that exceeds nine times the defendants' losses.  They are, therefore, inconsistent with the substantive due process limits recognized by the United States Supreme Court in *State Farm*.  Because the NBA must at least be interpreted to be consistent with constitutional limitations, it cannot authorize these unconstitutionally excessive punitive damages as legally enforceable.  Therefore, these over-limit fees are assessed outside the authority granted by the NBA in violation of 12 U.S.C. §§85 and 86.

110.    Defendants knowingly imposed over-limit fees for breaches of contract that exponentially exceed any damages actually incurred.  As a result, defendants knowingly imposed over-limit fees that are greater than what is allowed by the §85 of the NBA.

111.    Accordingly, plaintiffs and members of the classes named in this Count are entitled to bring this claim and to recover herein restitutionary disgorgement, compensatory damages, punitive and/or special damages, reasonable attorneys' fees, costs, and other injunctive and declaratory relief as may be available, including the recovery of two times the amount of over-limit fees charged during the statutory period.

**COUNT III**

**For Charging Excessive Late Fees in Violation of the Depository Institutions**
**Deregulation and Monetary Control Act of 1980**
**(12 U.S.C. §§1831d)**

112.    Plaintiffs reallege and incorporate by reference the allegations set forth above on behalf of themselves, the Nationwide Injunctive Relief Class and the Nationwide Late Fee Damages Class.

113.    Defendant WAMU, as an FDIC-regulated bank, is governed by the parallel provisions of the DIDA, 12 U.S.C. §1831d, which mirror the provisions of the NBA.  WAMU charges late fees in excess of what is authorized by the DIDA.  The DIDA authorizes the assessment of late fees in accord with the law of the state in which the issuer is chartered.  These late fees are punitive damages imposed on cardholders for breaches of contractual obligations.  Under principles of constitutional avoidance, the DIDA must be interpreted to be consistent with constitutional strictures.  Therefore, it must be interpreted to authorize only the assessment of those punitive damages that comport with substantive due process.  Further, the DIDA, properly interpreted, can only permit the exportation of those state statutes whose authorization of punitive late fees incorporates substantive due process limits.

114.    The exorbitant amount of late fees charged by defendant WAMU render them punitive damages that are excessively disproportionate to any losses suffered by defendant WAMU by a factor that exceeds nine times the defendant WAMU's losses.  They are, therefore, inconsistent with the substantive due process limits recognized by the United States Supreme Court in *State*

1  *Farm.*  Because the DIDA must be interpreted to be consistent with constitutional limitations, it

2  cannot authorize these unconstitutionally excessive punitive damages as legally enforceable.

3  Therefore, these late fees are assessed outside the authority granted by the DIDA in violation of 12

4  U.S.C. §1831d.

5      115.    Defendant WAMU knowingly imposed punitive late fees for breaches of contract that

6  exponentially exceeded any damages actually incurred.  As a result, defendant WAMU knowingly

7  imposed late fees that are greater than what is allowed by §1831d of DIDA.

8      116.    Accordingly, plaintiffs and members of the classes named in this Count are entitled to

9  bring this claim and to recover herein restitutionary disgorgement, compensatory damages, punitive

10  and/or special damages, reasonable attorneys' fees, costs, and other injunctive and declaratory relief

11  as may be available, including the recovery of two times the amount of late fees charged during the

12  statutory period.

13                          **COUNT IV**

14  **For Charging Excessive Over-limit Fees in Violation of the Depository Institutions
Deregulation and Monetary Control Act of 1980**

15                  **(12 U.S.C. §1831d)**

16      117.    Plaintiffs reallege and incorporate by reference the allegations set forth above on

17  behalf of themselves, the Nationwide Injunctive Relief Class and the Nationwide Over-Limit Fee

18  Damages Class.

19      118.    Defendant WAMU, as an FDIC-regulated bank, is governed by the parallel provisions

20  of the DIDA, 12 U.S.C. §1831d, which mirror the provisions of the NBA.  WAMU charges over-

21  limit fees in excess of what is authorized by the DIDA.  The DIDA authorizes the assessment of

22  over-limit fees in accord with the law of the state in which the issuer is chartered.  These over-limit

23  fees are punitive damages imposed on cardholders for breach of contractual obligations.  But the

24  DIDA must be interpreted to be consistent with constitutional strictures.  Therefore, it must be

25  interpreted to authorize only the assessment of those punitive damages that comport with substantive

26  due process limitations.  Further, the DIDA, properly interpreted, can only permit the exportation of

27  those state statutes whose authorization of punitive over-limit fees incorporates substantive due

28  process limits.

119.    The exorbitant size of over-limit fees charged by defendant WAMU render them punitive damages that are excessively disproportionate to any losses suffered by defendant WAMU by a factor that exceeds nine times the defendant WAMU's losses.  They are, therefore, inconsistent with the substantive due process limits recognized by the United States Supreme Court in *State Farm*.  Because the DIDA must be interpreted to be consistent with constitutional limitations, it cannot authorize these unconstitutionally excessive punitive damages as legally enforceable.  Therefore, these over-limit fees are assessed outside the authority granted by the NBA in violations of 12 U.S.C. §1831d.

120.    Defendant WAMU knowingly imposed over-limit fees for breaches of contract that exponentially exceed any damages actually incurred.  As a result, WAMU knowingly imposed over-limit fees that are greater than what is allowed by the §1831d of DIDA.

121.    Accordingly, plaintiffs and members of the classes named in this Count are entitled to bring this claim and to recover herein restitutionary disgorgement, compensatory damages, punitive and/or special damages, reasonable attorneys' fees, costs, and other injunctive and declaratory relief as may be available, including the recovery of two times the amount of over-limit fees charged during the statutory period.

**COUNT V**

**Violation of the Sherman Act (15 U.S.C. §1)**
**_Per Se_ Unlawful and Unreasonable Restraint in Trade**

122.    Plaintiffs reallege and incorporate by reference the allegations set forth above on behalf of themselves, the Nationwide Injunctive Relief Class and Nationwide Late Fee Damages Class.

123.    Defendants and their co-conspirators have continually engaged in an unlawful contract, combination and conspiracy in unreasonable restraint of trade and commerce in violation of §1 of the Sherman Act, 15 U.S.C. §1.

124.    The combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants, the substantial terms of which have been

1    to limit competition over the imposition, terms and pricing of late fees imposed on cardholders who

2    use defendants' credit card products.

3        125.    Defendants placed their credit card products into the stream of commerce with

4    knowledge that consumers would incur and pay late fees.

5        126.    At all times, the defendants had market power in the credit card market sufficient to

6    force plaintiffs and the class members named in this Count to accept cards with excessive and illegal

7    late fees and to set late fees at supra-competitive levels.

8        127.    The ability of plaintiffs and the classes to obtain credit cards without late fees or

9    which are set through competition unfettered by collusion, was and is effectively reduced, limited

10   and foreclosed.

11       128.    Defendants' combination and conspiracy has had and/or is likely to have the

12   following effects, among others:

13           (a)    Actual and potential competition in the credit card market with respect to the

14   imposition, terms and pricing of late fees has been limited, reduced, restrained, suppressed and

15   effectively foreclosed;

16           (b)    Late fees have been fixed and set at supra-competitive and disproportionate

17   levels;

18           (c)    Members of the classes have paid late fees set at supra-competitive levels; and

19           (d)    Defendants have derived direct and substantial economic benefit from their

20   anticompetitive conduct.

21       129.    As a remedy for defendants' and conspirators' violations of §1 of the Sherman Act,

22   plaintiffs and members of the classes have been injured in their business and property in an amount

23   not presently known with precision but which is, at a minimum, hundreds of millions of dollars prior

24   to trebling.

25       130.    Such violation and the effects thereof are continuing and will continue unless the

26   injunctive relief requested is granted.

27

28

**COUNT VI**

**Violation of Business & Professions Code §17200, *et seq*.**

131.    Plaintiffs reallege and incorporate by reference allegations set forth above on behalf of themselves, the California Late Fee Class and the California Over-limit Fee Class.

132.    Defendants' imposition and pricing of Penalty Fees constitutes unlawful business practices under the UCL because they violate the common law of contracts that prohibits imposing punitive damages for breaches of contract.  The NBA and DIDA cannot be invoked to defend the imposition of punitive Penalty Fees without limit, because the NBA and DIDA and regulations promulgated thereunder are either unconstitutional or must be interpreted to allow only punitive damages that comport with the substantive due process requirements articulated in *State Farm*. Defendants' Penalty Fees vastly exceed nine times their actual damages and thus violate the NBA and DIDA and regulations as constitutionally interpreted.  Nor can Cal. Fin. Code §4001 be invoked to defend the issuers' practice.  The Penalty Fees both vastly exceed what this provision authorizes on its face and what this provision actually authorizes, once interpreted to comport with the substantive due process requirements articulated in *State Farm*.  In addition, defendants' imposition of excessive Penalty Fees are unlawful business practices under the UCL because they violate the Sherman Act, the Cartwright Act, and the CLRA.

133.    Defendants' imposition and pricing of Penalty Fees also constitute deceptive business practices under the UCL because they are likely to mislead consumers into believing they are legally obligated to pay the level of Penalty Fees defendants impose when in fact the defendants' excessive punitive Penalty Fees are legally unenforceable.  Defendants conceal from cardholders the amount of actual damages they suffer from late payment and over limit charges.  Thus, cardholders have no way of knowing the maximum amount of penalties they are obligated to pay for breaching their contract with defendants by paying late or making charges that exceed their credit limit.  Defendants mischaracterized the Penalty Fees as "late fees" or "over-limit fees" instead of punitive penalties. Defendants knew or should have known that consumers would believe the Penalty Fees were legal and would pay them without questioning their punitive nature, legality or enforceability.

134.     The acts, omissions, misrepresentations, practices and non-disclosures of defendants as alleged also constitute unfair business practices because the imposition of Penalty Fees offends the established public policies of prohibiting punitive damages for breaches of contract and attempting to invoke unconstitutional interpretations of federal and state statutes and regulations. Defendants' practices of imposing excessive Penalty Fees are also immoral, unethical, oppressive, unscrupulous and substantially injurious to consumers.  The gravity of the harm defendants' practices cause far outweighs the utility of the imposition of excessive late fees.

135.     Plaintiffs and all members of the proposed classes have suffered the loss of money as a result of defendants' unlawful, deceptive and unfair business practices.

136.     As a result of defendants' violations of the UCL, plaintiffs and members of the classes named in this Count are entitled to bring this claim and to recover restitution, reasonable attorneys' fees, and costs and other injunctive or declaratory relief as may be available.

**COUNT VII**

**Violation of the CLRA**

137.     Plaintiffs reallege and incorporate by reference the allegations set forth above on behalf of themselves, the California Late Fee Class and the California Over-limit Fee Class.

138.     The CLRA, Civil Code §1750, *et seq.* has adopted a statutory scheme prohibiting various deceptive practices in connection with the conduct of a business providing goods, property or services primarily for personal, family or household purposes.

139.     The policies, acts and practices engaged in by defendants and alleged in this Complaint were intended to, and did, result in the payment of unconstitutionally disproportionate Penalty Fees by members of the classes, and violated and/or continue to violate the CLRA in at least the following respects:

(a)     Section 1770(a)(5) – representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he or she does not have;

(b)     Section 1770(a)(7) – representing that goods or services are of a particular standard, quality or grade if they are of another;

1        (c)      Section 1770(a)(9) – advertising goods or services with intent not to sell them

2 as advertised;

3        (d)      Section 1770(a)(14) – representing that a transaction confers or involves

4 rights, remedies, or obligations that it does not have or involve, or that are prohibited by law; and

5        (e)      Section 1770(a)(19) – inserting an unconscionable provision in the contract.

6        140.     Plaintiffs and members of the classes have suffered irreparable harm, entitling them to

7 both injunctive relief and restitution.

8        141.     In compliance with the provisions of Civil Code §1782, plaintiffs have given written

9 notice to defendants of their intention to file an amended complaint without leave of Court for

10 damages under Civil Code §1750, *et seq.* if defendants fail to offer appropriate consideration or other

11 remedy to all affected consumers as described in the written notice within 30 days of such written

12 notice. Defendants failed to respond to plaintiffs' demand within 30 days of such written notice and

13 have failed to offer appropriate consideration and remedy.

14       142.     Plaintiffs and members of the classes are entitled to, pursuant to Civil Code

15 §1780(a)(2), an order enjoining the defendants' above-described wrongful acts and practices,

16 providing restitution to plaintiffs and members of the classes, plus actual damages, punitive and

17 statutory damages and interest, and order the payment of costs and attorneys' fees and any other

18 relief deemed appropriate and proper by the Court under Civil Code §1780.

19                           **COUNT VIII**

20                 **Violation of the Cartwright Act**

21       143.     Plaintiffs reallege and incorporate by reference the allegations set forth above on

22 behalf of themselves and the California Late Fee Class.

23       144.     The agreements and practices described herein are prohibited by California's

24 Cartwright Act, Cal. Bus. & Prof. Code §§16700 and 16720, *et seq.*, because they constitute

25 combinations, contracts and conspiracies with the purpose and effect of restraining or restricting

26 trade and commerce, preventing or suppressing competition over the terms and pricing of late fees

27 and maintaining and increasing the price of late fees. The agreements and practices described herein

28 violated these statutes.

1    145.    As a result of these undisclosed agreements, plaintiffs and members of the class

2    named in this Count paid late fees in amounts and prices in excess of what they would have paid in a

3    competitive market, and sustained further damages due to the lack of competition over the terms of

4    late fees.  As a result of defendants' violations of the Cartwright Act, plaintiffs and the California

5    Late Fee Class are entitled to bring this claim and to recover herein damages, which are subject to

6    trebling according to law, reasonable attorneys' fees, and costs and other injunctive or declaratory

7    relief as may be available.

8                                              **COUNT IX**

9                        **Breach of Covenant of Good Faith and Fair Dealing**

10    146.    Plaintiffs reallege and incorporate by reference allegations set forth above on behalf

11    of themselves, the California Late Fee Class and the California Over-limit Fee Class.

12    147.    The requirement of "good faith" reflects on the principle of fair and open dealing with

13    consumers.  It does not simply mean that terms must not be used deceitfully; it means that terms

14    should be drafted in a way that respects consumers' legitimate interests.  The test of fairness involves

15    not only how a term is used, but how it could be used.  In addition, the test of fairness also takes

16    account of the circumstances surrounding the conclusion of the contract and the effect of the other

17    terms in the contract.  The contracts between defendants and each class member are simply a

18    covenant of good faith and fair dealing.  By imposing excessive late fees and over-limit fees in

19    violation of the law, defendants uniformly breached this covenant of good faith and fair dealing.

20    148.    Contract law prohibits defendants from imposing punitive damages for breaches of

21    the standardized credit card agreements, such as late payments and incurring charges over a

22    consumer's credit limit.  Penalty Fees imposed for such breaches are a form of punitive damages.

23    Until 2003, defendants believed that state and federal statutes and regulations allowed them to

24    bypass longstanding contract law and impose whatever level of punitive damages they chose when

25    cardholders made late payments or incurred charges over their credit limit.  In 2003, however, the

26    Supreme Court held that the United States Constitution, under the Due Process Clause, prohibits

27    punitive damages that exceed nine times actual damages.  The statutes and regulations allowing

28    punitive damages for late payments and over the limit fees must be interpreted to comport with these

1   Due Process requirements.  Accordingly, defendants charge late fees and over-limit fees that exceed

2   what the statutes and regulations allow.

3                                              **COUNT X**

4                        **Unjust Enrichment/Restitution/Constructive Trust**

5          149.    Plaintiffs reallege and incorporate by reference the allegations set forth above on

6   behalf of themselves, the California Late Fee Class and the California Over-limit Fee Class.

7          150.    This Count is alleged against all defendants.  Defendants have benefited from their

8   unlawful and inequitable acts alleged in this Complaint.  Defendants' financial benefits resulting

9   from their unlawful and inequitable conduct are traceable to payments of unlawful Penalty Fees

10  resulting from defendants' exceeding the bounds of the NBA and DIDA that transgress substantive

11  due process limits on punitive damages, defendants' deceptive and unfair practices described herein

12  and defendants' unlawful combination and conspiracy to restrain trade in the setting and

13  maintenance of credit card Penalty Fees.

14         151.    The classes have conferred upon defendants an economic benefit, in the nature of

15  profits resulting from unlawful Penalty Fees, to the economic detriment of plaintiffs and the

16  members of the classes.

17         152.    The economic benefit of Penalty Fees and unlawful profits derived by defendants

18  through charging penalties in excess of what is authorized by the NBA and DIDA for exceeding

19  their credit limit or for making a late payment of credit card bills is a direct and proximate result of

20  defendants' unlawful practices.

21         153.    The financial benefits derived by defendants by reason of their unlawful conduct

22  rightfully belong to plaintiffs and the classes, as they have paid unlawful Penalty Fees during the

23  Class Period, inuring to the benefit of defendants.

24         154.    It would be inequitable for the defendants to be permitted to retain any of the Penalty

25  Fees derived from defendants' unfair and unconscionable methods, acts and trade practices alleged

26  in this Complaint.

27         155.    Defendants should be compelled to disgorge into a common fund for the benefit of

28  plaintiffs and the classes all unlawful or inequitable proceeds received by them through the

1  imposition of Penalty Fees.  A constructive trust should be imposed upon all sums unlawfully or

2  inequitably received by defendants traceable to plaintiffs and the classes from which plaintiffs and

3  the other class members may make claims for restitution.

**PRAYER FOR RELIEF**

4

5       WHEREFORE, plaintiffs pray:

6       A.    That the Court declare, adjudge and decree that defendants have committed the

7  violations of federal and state law alleged herein;

8       B.    That the Court enter an order pursuant to Rule 23 of the Federal Rules of Civil

9  Procedure permitting this action to be maintained as a class action on behalf of the classes specified

10  herein and that plaintiffs' counsel be appointed class counsel pursuant to Rule 23(g);

11       C.    That the defendants, their directors, officers, employees, agents and successors be

12  enjoined and restrained from, in any manner, directly or indirectly, continuing the illegal course of

13  conduct alleged herein;

14       D.    That the Court order defendants to return to the cardholders twice the amount of late

15  fees and over-limit fees charged for the statutory period defined in the NBA and DIDA;

16       E.    That the Court award damages, sustained by the plaintiffs and members of the classes

17  as a result of violation of the Sherman Act, 15 U.S.C. §1, *et seq.* and the Cartwright Act, an amount

18  to be proved at trial, to be trebled according to law, plus interest, attorneys' fees and costs of suit;

19       F.    That the Court award actual and special damages sustained by the plaintiffs and

20  members of the classes as a result of violation of the CLRA, Civil Code §1750, *et seq.*, plus interest,

21  attorneys' fees and costs of suit;

22       G.    That the Court order disgorgement of defendants' ill-gotten gains and/or impose a

23  constructive trust upon all such ill-gotten gains and award plaintiffs and class members full

24  restitution of all monies wrongfully acquired by defendants;

25       H.    That plaintiffs and other members of the classes be granted such other, further and

26  different relief that is necessary to prevent a recurrence of the conspiracy; and

27       I.    That the Court award plaintiffs their attorneys' fees, costs and prejudgment interest

28  and such other and further relief as this Court may deem just and proper.

1

**JURY DEMAND**

2
Plaintiffs respectfully demand a trial by jury of issues properly triable thereby.

3
DATED: May 8, 2007

LERACH COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
CHRISTOPHER M. BURKE
ELISABETH A. BOWMAN
MARY LYNNE CALKINS

4

5

6

7

8

           s/CHRISTOPHER M. BURKE
            CHRISTOPHER M. BURKE

9
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

10

11
SCHRAG & BAUM, P.C.
THOMAS F. SCHRAG
JAMES S. BAUM
280 Panoramic Way
Berkeley, CA  94704
Telephone:  510/849-1618
510/841-6050 (fax)

12

13

14

15
MEADE & SCHRAG LLP
TYLER R. MEADE
MICHAEL L. SCHRAG
1816 Fifth Street
Berkeley, CA  94710
Telephone:  510/843-3670
510/843-3679 (fax)

16

17

18

19
BUSHNELL, CAPLAN, FIELDING
  & MAIER, LLP
ALAN M. CAPLAN
221 Pine Street, Suite 600
San Francisco, CA  94104-2715
Telephone:  415/217-3800
415/217-3820 (fax)

20

21

22

23
DONOVAN SEARLES LLC
MICHAEL DONOVAN
1845 Walnut Street, Suite 1100
Philadelphia, PA  19103
Telephone:  215/732-6067
215/732-8060 (fax)

24

25

26

27

28

1
2          GUSTAFSON GLUEK PLLC
           DANIEL E. GUSTAFSON
3          BRIAN WILLIAMS
           650 Northstar East
4          608 Second Avenue South
           Minneapolis, MN 55402
5          Telephone:  612/333-8844
           612/339-6622 (fax)
6
           HULETT HARPER STEWART, LLP
7          DENNIS STEWART
           550 West C Street, Suite 1600
8          San Diego, CA  92101
           Telephone:  619/338-1133
9          619/338-1139 (fax)

10         LAW OFFICE OF ANDREW KIERSTEAD
           ANDREW S. KIERSTEAD
11         1001 SW  5th Avenue, Suite 1100
           Portland, OR 97204
12         Telephone:  508/224-6246
           508/224-4356 (fax)
13
           SCOTT + SCOTT LLP
14         ARTHUR L. SHINGLER III
           600 B Street, Suite 1500
15         San Diego, CA  92101
           Telephone:  619/233-4565
16         619/233-0508 (fax)

17         Attorneys for Plaintiffs

S:\CasesSD\Late Fees\CPT00041615-Cons2.doc

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATION OF INTERESTED ENTITIES OR PERSONS**

Pursuant to Civil L.R. 3-16, the undersigned certifies that as of this date, other than the names parties, there is no such interest to report.

s/CHRISTOPHER M. BURKE

ATTORNEY OF RECORD FOR PLAINTIFFS ANDREW T. PIÑON, BETTY SIMM, CATHY SIMM, SARA PRENTISS-SHAW, AUDREE HALASZ, DAVID V. BROTMAN, GWEN MARTIN, CELESTE BRACKLEY, MARILYN FOSTER-NEMEC, AARON GONZÁLEZ AND ELIZABETH YOUNG

1

<u>CERTIFICATE OF SERVICE</u>

2

     I hereby certify that on May 8, 2007, I electronically filed the foregoing with the Clerk of the

3

Court using the CM/ECF system which will send notification of such filing to the e-mail addresses

4

denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the

5

foregoing document or paper via the United States Postal Service to the non-CM/ECF participants

6

indicated on the attached Manual Notice List.

7

     I certify under penalty of perjury under the laws of the United States of America that the

8

foregoing is true and correct.  Executed on May 8, 2007.

9

10

                      s/ CHRISTOPHER M. BURKE
                      CHRISTOPHER M. BURKE

11

                      LERACH COUGHLIN STOIA GELLER

12

                         RUDMAN & ROBBINS LLP
                      655 West Broadway, Suite 1900

13

                      San Diego, CA  92101-3301
                      Telephone:  619/231-1058

14

                      619/231-7423 (fax)

15

                      E-mail:ChrisB@LerachLaw.com

16

17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 4:07-cv-00634-SBA

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **James Samuel Baum**
  jim@schragbaum.com

- **Christopher M. Burke**
  chrisb@lerachlaw.com christinas@lerachlaw.com;gweston@lerachlaw.com

- **Mary Lynne Calkins**
  mcalkins@lerachlaw.com

- **Patrick J. Coughlin**
  patc@lerachlaw.com e_file_sf@lerachlaw.com

- **Andrew J. Ewalt**
  andrew.ewalt@wilmerhale.com

- **Geoffrey M. Ezgar**
  gezgar@sidley.com grodriguez@sidley.com;ldonohue@sidley.com

- **David F. Graham**
  dgraham@sidley.com efilingnotice@sidley.com

- **Eric Henry Grush**
  egrush@sidley.com efilingnotice@sidley.com

- **David M. Jolley**
  djolley@cov.com

- **William J. Kolasky**
  william.kolasky@wilmerhale.com catherine.goodman@wilmerhale.com

- **Jennifer Haejoo Lee**
  jennifer.lee@wilmerhale.com

- **Noah Adam Levine**
  noah.levine@wilmerhale.com

- **Christopher Robin Lipsett**
  Christopher.Lipsett@wilmerhale.com Stella.Siebert@wilmerhale.com

- **James F. McCabe**
  JMcCabe@mofo.com marcim@mofo.com

- **Tyler Roberts Meade**

tyler@meadeschrag.com raquel@meadeschrag.com

- **Stephen J. Newman**
  SNEWMAN@STROOCK.COM
  snewman8@yahoo.com;sturner@stroock.com;lacalendar@stroock.com

- **Stuart C. Plunkett**
  splunkett@mofo.com tarmaz@mofo.com

- **Theodore Robert Scarborough, Jr**
  tscarborough@sidley.com efilingnotice@sidley.com

- **Michael Lawrence Schrag**
  michael@meadeschrag.com raquel@meadeschrag.com

- **Thomas Frank Schrag**
  tom@schragbaum.com

- **Arthur L. Shingler, III**
  ashingler@scott-scott.com ssawyer@scott-scott.com

- **Cathleen Ellis Stadecker**
  cstadecker@mofo.com

- **Anita Fern Stork, Esq**
  astork@cov.com malcantara@cov.com

- **Michael F. Tubach**
  mtubach@omm.com lvichich@omm.com;cchiu@omm.com

- **Jennifer S Wang**
  jwang@omm.com wmartens@omm.com

- **Sonya D. Winner**
  winnersd@cov.com hsalazar@cov.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Kelly Thompson Cochran
Wilmer Cutler Pickering and Dorr LLP
1875 Pennsylvania Avenue, N.W.
Washington, DC 20006

David J. Fioccola
Morrison & Foerster, LLP
1290 Avenue of the Americas
New York, NY 10104-0050
```

**Andrew J. Frackman**
O'Melveny & Myers LLP
Times Square Tower
Seven Times Square
New York, NY 10036

**Noel C. Johnson**
Washington Mutual Bank
201 Mission Street
28th Floor
San Francisco, CA 94110

**Mark P. Ladner**
Morrison & Foerster LLP
1290 Avenue of the Americas
New York, NY 10104