1
2

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# OAKLAND DIVISION

3

4    IN RE LATE FEE AND
     OVER-LIMIT FEE LITIGATION

5

No. C 07-0634 SBA

**ORDER**

6

7

_____

8        Before the Court is the defendants'[1] joint motion to dismiss [Docket No. 91] the plaintiffs'[2]

9   consolidated complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  After reading and

10  considering the complaint and the arguments presented by the parties, the Court finds this matter

11  appropriate for resolution without a hearing.  *See* FED. R. CIV. P. 78.  For the reasons that follow, the

12  Court GRANTS the defendants' motion to dismiss.

13

14                                    **BACKGROUND**

15        The plaintiffs represent a putative class of "credit cardholders who have paid excessive late fees

16  and/or over-limit fees ("Penalty Fees")" to the defendants, most of the large credit card issuers in the

17  United States.  Docket No. 63 (Compl. ¶ 1).  The plaintiffs allege that "these excessive Penalty Fees

18  violate[ ] the National Bank Act's ("NBA") and the Depository Institutions Deregulation and Monetary

19  Control Act of 1980's ("DIDA") prohibitions against overcharging consumers.  In addition, defendants

20  have conspired to fix prices and maintain a price floor for late fees in violation of §1 of the Sherman

21  Act."  *Id.*  According to the plaintiffs, when credit card holders are late in making payments or go over

22  their credit limits, the cardholders are charged up to $39 dollars in late fees and over-limit fees by the

23  _____

[1]    The defendants are Bank of America, N.A.; Bank of America Corporation; N.B. Holdings;
24     MBNA America Bank, N.A.; Capital One Bank; Capital One F.S.B.; Capital One Financial
       Corporation; Chase Bank USA, N.A.; JPMorgan Chase & Co.; Bank One Corporation; Bank
25     One; Citibank South Dakota, N.A.; Citigroup, Inc.; Washington Mutual Bank; Providian;
       Washington Mutual, Inc.; Wells Fargo & Company; Wells Fargo Bank, N.A.; Wells Fargo
26     Financial Bank; and Wells Fargo Financial National Bank.

27  [2]    The plaintiffs are Andrew T. Piñon, Betty Simm, Cathy Simm, Sara Prentiss-Shaw, Audree
       Halasz, David V. Brotman, Gwen Martin, Celeste Brackley, Marilyn Foster-Nemec, Aaron
28     González, and Elizabeth Young.

defendants.  The plaintiffs seek to represent nationwide and California classes of persons holding credit cards issued by the defendants and are requesting injunctive relief and damages on behalf of all holders of credit cards issued by the defendants.  *See* Docket No. 63 (Compl. ¶¶ 38-41).

The complaint contends that the defendants together control over seventy percent of the U.S. credit card market.  *See* Docket No. 63 (Compl. ¶ 86).  In general, the complaint's substantive allegations refer to the defendants in collective terms and do not advance individualized allegations about particular defendants.[3]

The plaintiffs assert multiple causes of action based on allegedly high late and over-limit fees that the defendants charged on credit card accounts.  They assert two primary federal causes of action (constitutional due process claims and antitrust claims) and several causes of action under California state law.  Counts One through Four of the complaint allege the defendants' charging of late and over-limit fees violates the National Bank Act (12 U.S.C. §§ 85, 86) and the Depository Institutions Deregulation and Monetary Control Act of 1980 (12 U.S.C. § 1831d).  Count Five asserts the defendants are transgressing the antitrust provision of section 1 of the Sherman Act.  Counts Six through Ten put forward claims under California law: the Unfair Competition Law, the Consumers Legal Remedies Act, the Cartwright Act, breach of covenant of good faith and fair dealing, and unjust enrichment, respectively.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(6) provides that a pleading may be challenged and dismissed for failing to "state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6).  The

---

[3] Each plaintiff claims to have paid at least one late or over-limit fee in the four years preceding the filing of the complaint.  *See* Docket No. 63 (Compl. ¶¶ 12-22.)  No plaintiff identifies which of the defendants (if any) issued a credit card to him or her, no plaintiff specifies which type of fee (*i.e.*, late fee or over-limit fee) he or she has paid, and no plaintiff pleads to which of the defendants (if any) he or she paid that unspecified fee.  The plaintiffs do not allege that the defendant holding companies issued their credit cards, imposed late or over-limit fees on them, or otherwise took any action in connection with the conduct that the complaint raises.

minimum pleading requirement is set by Rule 8(a), requiring a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002); *see also Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007) (per curiam). While a complaint "does not need detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007). A complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974.

When considering a motion to dismiss under Rule 12(b)(6), the plaintiff's complaint is liberally construed and all well-pleaded facts are taken as true. *Syverson v. IBM Corp.*, 472 F.3d 1072, 1075 (9th Cir. 2007). However, conclusory allegations of law, unwarranted deductions of fact, or unreasonable inferences are insufficient to defeat a motion to dismiss. *See Fields v. Legacy Health Sys.*, 413 F.3d 943, 950 n.5 (9th Cir. 2005); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Courts generally do not look outside the pleadings, including any attachments thereto, in deciding a motion to dismiss. *See United States v. LSL Biotechs.*, 379 F.3d 672, 699 (9th Cir. 2004). A document is not considered outside the complaint if it is "incorporated by reference," *i.e.*, the complaint specifically refers to the document and if its authenticity is not questioned. *See Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005); *Cooper v. Pickett*, 137 F.3d 616, 622-23 (9th Cir. 1997). If dismissal of the complaint is warranted, it is generally without prejudice, unless it is clear that the complaint can not be saved by any amendment. *See Sparling v. Daou*, 411 F.3d 1006, 1013 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1335 (2006); *Gompper v. VISX, Inc*., 298 F.3d 893, 898 (9th Cir. 2002).

## ANALYSIS

### A.      Counts One Through Four

The plaintiffs' principal claim in this case is that the defendants impose late and over-limit fees

up to $39, and that such fees significantly exceed any actual damages that the defendants incur as a result of cardholders' making late payments or exceeding their credit limits. On this basis, plaintiffs assert that the defendants' late and over-limit fees are excessive "punitive damages" subject to limitation under the Due Process Clause as interpreted in *State Farm Mutual Automobile Ins. Co. v. Campbell*, 538 U.S. 408 (2003), and other recent Supreme Court decisions. In *State Farm*, the Supreme Court addressed "the measure of punishment, by means of punitive damages, *a State may impose* upon a defendant in a civil case." *Id.* at 412 (emphasis supplied). The Court reiterated prior holdings that "there are procedural and substantive constitutional limitations on these awards [State imposed punitive damages]." *Id.* at 416. The Court declared that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425. "Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 . . . ." *Id.*

The plaintiffs contend that the Court must interpret federal banking statutes, principally the National Bank Act (NBA),[4] to incorporate *State Farm*'s Due Process limits on credit card late and over-limit fees, as the plaintiffs equate such fees as "punitive damages." They also assert that the remedial provisions of the banking statutes, such as 12 U.S.C. § 86, provide them with a cause of action for such allegedly excessive fees.

Section 85 of the NBA allows the defendants to "take, receive, reserve, and charge . . . interest at the rate allowed by the laws of the State, Territory, or District where the bank is located . . . ." 12

---

[4] The plaintiffs assert claims under the NBA with respect to all defendants except Washington Mutual Bank, which they allege is subject to the Depository Institutions Deregulation and Monetary Control Act, 12 U.S.C. § 1831d. The defendants maintain that Washington Mutual Bank is in fact subject to 12 U.S.C. § 1463. Because the parties do not dispute that the various provisions are virtually identical, the Court will refer solely to the NBA.

The NBA authorizes a national bank to charge whatever rates are allowed by the laws of the state where the bank is located. Here, in the states where the defendant banks are located, the state laws allow any rates agreed to in the contracts between the banks and their customers. *See* DEL. CODE, tit. 5, §§ 943-945, 950; NEV. REV. STAT. § 99.050; S.D. CODIFIED LAWS § 54-3-1.1; VA. CODE ANN. § 6.1-330.63(A).

4

U.S.C. § 85.  Section 86 of the NBA provides the remedy for overcharges of amounts allowed under section 85:

> The taking, receiving, reserving, or charging a rate of interest greater than is allowed by section 85 of this title, when knowingly done, shall be deemed a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon.  In case the greater rate of interest has been paid, the person by whom it has been paid, or his legal representatives, may recover back, in an action in the nature of an action of debt, twice the amount of the interest thus paid from the association taking or receiving the same . . . .

12 U.S.C. § 86.

Despite the language of section 85 allowing interest rates to be set at a rate consistent with the laws of the home states of the defendants, the plaintiffs argue that the Court should construe section 85 to implicitly constrain the late and over-limit fees to amounts not excessively disproportionate to the actual losses suffered by the credit card issuers.  The plaintiffs contend that it is necessary to interpret section 85 as containing an "implicit" interest limitation other than that set by state law in light of *State Farm* and the canon of statutory construction of constitutional avoidance.[5]  In other words, the plaintiffs are arguing that the Court should construe the NBA as allowing the "exportation" of only those home state penalty fees that are not excessively disproportionate to the actual losses incurred by the defendants from late payments because such penalty fees are excessive "punitive damages" prohibited by *State Farm*.  In order to save the NBA from this constitutional infirmity, the Court must read section 85 as containing a limitation not provided for in its text.  And once section 85 is thus "construed," the defendants' actions are then in violation of section 86 and the plaintiffs have a viable cause of action for damages.  These factual gyrations are flawed, however, and when unwound and examined, fail to state a claim.

Counts One through Four fail as a matter of law to state claims upon which relief can be granted.

---

[5]  Based upon the doctrine of constitutional avoidance, "where an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (citing *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 499-501, 504 (1979)).

First, the defendants' late and over-limit fees are not "punitive damages" subject to the Due Process Clause. The punitive damages at issue in *State Farm* and similar Supreme Court decisions are damages that a court, *i.e.*, the state, levies against a defendant to "punish reprehensible conduct and . . . deter its future occurrence" for the benefit of society generally. *International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 48 (1979) (citation omitted). Such damages "serve the same purposes as criminal penalties," *State Farm*, 538 U.S. at 416, by punishing and deterring conduct that is deemed particularly reprehensible and "pose[s] a substantial risk of harm to the general public." *Philip Morris USA v. Williams*, 127 S. Ct. 1057, 1064 (2007).

The plaintiffs have not shown that the defendants' late and over-limit fees fit within this rubric. The fees are not imposed by a court and they are not in any sense penalties "advanc[ing] governmental objectives," *Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 47 (1991), to protect against behavior that harms the "general public." *Phillip Morris USA*, 127 S. Ct. at 1064. Rather, they are paid by one party to another pursuant to private contract.

The Supreme Court also has explained that punitive damages implicate the Due Process Clause because their discretionary, case-variable nature can contravene "'[e]lementary notions of fairness enshrined in our constitutional jurisprudence'" which "'dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that the State may impose." *State Farm*, 538 U.S. at 417 (citation omitted). Thus, "the fundamental due process concerns to which [the Supreme Court's] cases refer" are "risks of arbitrariness, uncertainty, and lack of notice." *Phillip Morris USA*, 127 S. Ct. at 1063. None of these considerations apply to the defendants' late and over-limit fees. The fees are not uncertain in amount, nor do cardholders lack notice regarding the amount or existence of the fees. To the contrary, the parties establish the fees in advance in the written credit-card contract.

The plaintiffs rely on common law doctrines that characterize excessive contract damages as "punitive" in nature or as "penalties." But the use of that terminology does not mean that the contract damages they describe are therefore "punitive damages" subject to the Due Process Clause. Private

contractual fees, regardless of whether they are "punitive" in a contractual sense, bear no resemblance to the court-imposed awards that the Supreme Court has subjected to constitutional scrutiny. The plaintiffs cite no authorities suggesting that the Supreme Court's punitive damages jurisprudence applies to privately set contractual fees. And any claims that the defendants' fees violated the contractual doctrines of liquidated damages or the like are pre-empted. *See Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 744 (1996).

Second, even if the defendants' fees could be regarded as some kind of private "punitive damages," the fees still would not implicate the Constitution. The Due Process Clause constrains government action; it does not restrain or protect against "private conduct." *Blum v. Yaretsky*, 457 U.S. 991, 1002 (1982). The defendants' late and over-limit fees are not set by governmental mandate; their imposition and amount are the product of private contract between bank and borrower. The mere fact that federal banking statutes allow the defendant banks and the plaintiffs to enter into private contracts allowing for such fees does not transform the charging of those fees into state action. *See id.* The "mere availability of a remedy" and the "subtle encouragement . . . which inheres in the [government's] creation or modification of any legal remedy" do not "so significantly encourage[ ] the private activity as to make the [government] responsible for it." *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 53 (1999). Indeed, the plaintiffs' argument runs counter to the principles animating the Due Process Clause. That Clause serves to restrain government encroachment upon private parties' liberty and property interests. Congress does not offend the Due Process Clause by legislating to permit parties freedom in arranging their private credit arrangements. To the contrary, that governmental objective is entirely rational and constitutional. *See United States v. Carolene Prods. Co.*, 304 U.S. 144, 152 (1938) ("regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless . . . it is of such a character as to preclude the assumption that it rests upon some rational basis . . . .").

Finally, there is no basis for the plaintiffs' assertion of a damages claim under the NBA. The plaintiffs' theory is that, pursuant to the doctrine of constitutional avoidance, this Court should construe

the usury provision of the NBA, 12 U.S.C. § 85, to incorporate Due Process Clause limits on "punitive damages," as articulated in *State Farm* and similar decisions. The theory fails on two grounds. Initially, for the reasons described above, the plaintiffs have not shown the existence of any "'grave and doubtful constitutional questions'" that the Court should seek to avoid through statutory construction. *Rust v. Sullivan*, 500 U.S. 173, 191 (1991) (citation omitted). In addition, the doctrine of constitutional avoidance applies only where statutory text is "susceptible of two constructions," *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (citation omitted), based on "ordinary textual analysis." *Clark v. Martinez*, 543 U.S. 371, 385 (2005). That is not the case with section 85 of the NBA. That provision allows banks to charge "interest at the rate allowed by the laws of the State . . . where the bank is located." There is nothing ambiguous about that text, nor is there any term therein that could be construed to express the Due Process Clause limit the plaintiffs seek to have written into the statute. It is undisputed that late and over-limit fees are "interest" within the meaning of the statute, *see* 12 C.F.R. § 7.4001(a)[6]; *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 745 (1996), and the laws of the states in which defendant banks are located expressly allow banks to charge fees at any amount specified in their credit card contracts. The plaintiffs therefore cannot recover damages under section 86 of the NBA.

## B.    Counts Five and Eight

In Counts Five and Eight, the plaintiffs claim that the defendants conspired to fix the terms and pricing of late fees in violation of section 1 of the Sherman Act and California's Cartwright Act,

---

[6]    Title 12 C.F.R. § 7.4001(a) defines "interest" as used in 12 U.S.C. § 85 as including: "any payment compensating a creditor or prospective creditor for an extension of credit, making available of a line of credit, or any default or breach by a borrower of a condition upon which credit was extended. It includes, among other things, the following fees connected with credit extension or availability: numerical periodic rates, late fees, creditor-imposed not sufficient funds (NSF) fees charged when a borrower tenders payment on a debt with a check drawn on insufficient funds, overlimit fees, annual fees, cash advance fees, and membership fees. It does not ordinarily include appraisal fees, premiums and commissions attributable to insurance guaranteeing repayment of any extension of credit, finders' fees, fees for document preparation or notarization, or fees incurred to obtain credit reports."

8

respectively.  Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."  To state a claim under section 1, a plaintiff must allege that "(1) there was an agreement, conspiracy, or combination between two or more entities; (2) the agreement was an unreasonable restraint of trade under either a per se or rule of reason analysis; and (3) the restraint affected interstate commerce."  *American Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 784 (9th Cir. 1996); *see also Tanaka v. University of S. Cal.*, 252 F.3d 1059, 1062 (9th Cir. 2001) (same).

The plaintiffs do not identify any actual agreement among the defendants.  Rather, the plaintiffs allege that some of the defendant banks, at some times during the last decade had late fee terms on some credit card accounts that were in part parallel behavior, or "lockstep pricing" of late fees.  The plaintiffs also allege that there were opportunities and incentives for the defendant banks to enter into agreements about pricing, even if the plaintiffs cannot identify any such agreement.  The plaintiffs contend that alleging such opportunities and incentives, together with the partially parallel conduct, states a claim on which relief can be granted under the Sherman Act.

Relying to a large extent on the Supreme Court's recent decision in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the defendants move to dismiss Count Five on the ground that the plaintiffs have not adequately alleged the first element of a section 1 claim—an "agreement, conspiracy, or combination."  *Twombly* dealt with the "question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act."  *Twombly*, 127 S. Ct. at 1964.  In that case the Supreme Court stated:

> Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

127 S. Ct. at 1966.  Based upon the pleading standards set forth by *Twombly*, the Court concludes that the plaintiffs' complaint fails as a matter of law to state a claim on which relief can be granted under section 1 of the Sherman Act.

9

The heart of the plaintiffs' antitrust allegations is paragraph 86 of the complaint, containing a chart of allegedly current late-fee levels of the six defendant banking organizations, and the surrounding paragraphs which discuss late-fee levels at other times.[7]   The chart alleges that, at present, three defendants have late fees for at least some credit cards at the following levels: they charge $15 for late payment if the customer's balance is up to $100; $29 for a late payment if the customer's balance is $100 to $250; and $39 for a late fee if the customer's balance is higher.  This allegation is the plaintiffs' centerpiece, but it does not suggest a "preceding agreement" rather than "merely parallel conduct that could just as well be independent action."  The same chart shows that the three other alleged co-conspirators have *different* late-fee price levels.  The complaint further explains that the defendants' fee levels have all followed different pricing paths at different times, not even roughly in parallel.  For example, Citibank implemented its three-tier late-fee billing structure in 2001, while Capital One and Washington Mutual did not adopt any kind of tiered late fees until three years later and even then adopted different tiered structures.

As the Supreme Court explained in *Twombly*, this kind of pricing pattern is "just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market," 127 S. Ct. at 1964, as it is with an agreement on pricing.  *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 131-32 (3d Cir. 1999) (holding that time lags of three to six months between pricing moves "refute rather than support" allegations of conspiracy).  To survive the motion to dismiss, the plaintiffs are required to allege some "further circumstance pointing toward a meeting of the minds." *Twombly*, 127 S. Ct. at 1966.  Those circumstances must be enough to make the claim of conspiracy not merely "conceivable" but in fact "plausible." *Id*. at 1974.  The plaintiffs have not met this standard.

The complaint does include several conclusory allegations that the defendants agreed to increase late fees, but it provides no details as to when, where, or by whom this alleged agreement was reached.

---

[7]    The chart lists seven card issuers, but two are controlled by defendant Bank of America.

10

*See* Docket No. 63 (Compl. ¶¶ 72, 123-24).  In *Twombly*, the Supreme Court dismissed as insufficient similar "stray statements" about agreements, when unsupported by concrete allegations about the content and circumstances of any actual agreement.  127 S. Ct. 1971 n.10.

Moreover, as in *Twombly*, the complaint itself provides an alternative explanation for the increases in late fees, namely that they were the result of a "rational and competitive business strategy unilaterally prompted by common perceptions of the market."  127 S. Ct. at 1964.  The complaint alleges, for example, that the defendants all faced declining interest rate revenue (Compl. ¶ 62), increased competition from new market entrants (*id*. ¶ 75), elimination of annual fees as a revenue source (*id*. ¶ 74), and higher costs due to expanded reward and affinity programs (*id*.).  Confronted with that competitive environment, it would have been entirely rational for each defendant *independently* to decide to increase late fees as a way to raise revenue, "expecting [its] neighbors to do the same thing." *Twombly*, 127 S. Ct. at 1972.[8]  And it would have been equally rational for the other defendants to follow those increases, rather than seek to undercut them, since "surely they knew the adage about him who lives by the sword."  *Id*.

The plaintiffs suggest that it is somehow suspicious that the defendants increased late fees contemporaneously with reducing what plaintiffs call "front end" features such as annual fees and interest rates.  Docket No. 63 (Compl. ¶ 88).  But here, as in *Twombly*, the complaint fails to allege facts showing that it would have been "potentially more lucrative," 127 S. Ct. at 1972, to compete by cutting late fees.  What the plaintiffs term "front end" features, *e.g*., no annual fees, low interest fees for balance transfers, cash back awards, are highly visible to prospective cardholders.  Thus, the plaintiffs' allegation that credit card issuers have competed vigorously for consumer business by focusing on "front end" features suggests nothing more than a common recognition among issuers that those "front end" features have the greatest marketing potential.  *See* Docket No. 63 (Compl. ¶ 88).

---

[8]   The complaint also explains why late fees were lower before 1995: state regulatory provisions constrained late fees until 1995, when the Comptroller of the Currency issued a regulation interpreting the NBA to preempt those laws.  *See* Docket No. 63 (Compl. ¶¶ 3, 62-63).

Therefore, as in *Twombly*, when viewing the entire complaint, the plaintiffs have not placed their allegations "in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id*. at 1966; *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, ---, 2007 WL 2471805, at *3 (2d Cir. 2007) (per curiam) (affirming dismissal of section 1 claim based in part on allegations of parallel pricing because "similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy").

In their brief, the plaintiffs rely on a variety of what they call "plus factors" to raise the inference of conspiracy set the price of late fees to the level of plausibility. *See* Docket No. 94 (Pl.'s Br. 19-23). The plaintiffs in *Twombly* alleged many of these same "plus factors," but here, as there, the factors, whether taken singly or together, are insufficient to plead a case. Following are the "plus factors" identified by the plaintiffs:

**1.    Opportunities to Communicate**

The plaintiffs argue that the defendants' membership in the Visa and MasterCard networks, their relationships with third-party processors and consultants that did business with many industry participants, and their membership in industry-wide trade associations, provided opportunities for them to communicate and agree to fix prices. *See* Docket No. 63 (Compl. ¶¶ 80-81, 87). The Supreme Court rejected similar allegations in *Twombly*, 127 S. Ct. at 1971 n.12, and other courts have consistently refused to infer the existence of a conspiracy from these kinds of averments. *See, e.g., In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999); *In re Ins. Brokerage Antitrust Litig.*, 2006 WL 2850607, at *12 (D.N.J. 2006); *In re Elevator Antitrust Litig.*, 2006 WL 1470994, at *11 (S.D.N.Y. 2006); *Yellow Page Solutions, Inc. v. Bell Atl. Yellow Pages Co.*, 2001 WL 1468168, at *13 (S.D.N.Y. 2001).

**2.    Market Concentration**

The complaint alleges that the defendants have a combined 70% share of the credit card market (Compl. ¶ 6), and the plaintiffs argue that such concentration is conducive to conspiracy. *See* Docket No. 94 (Pls.' Br. 22). But the relevant market in *Twombly*—where defendants were alleged to possess a 90% share—was more highly concentrated, and the Supreme Court nevertheless concluded that the

12

complaint there failed to state a claim under section 1.  127 S. Ct. at 1962 n.1.  As the *Twombly* Court noted, parallel behavior in a concentrated market is insufficient to suggest a conspiracy because it is a "common reaction of firms in a concentrated market" to "recogniz[e] their shared economic interests" and to reach similar "price and output decisions" independently.  *Id.* at 1964 (citation omitted, alteration in original).  Thus, even if the alleged market were concentrated, this would not render the asserted conspiracy plausible.

### 3.  Motive to Conspire

The plaintiffs argue that "defendants had a strong motive to fix the prices of late fees at supra-competitive levels."  Docket No. 94 (Pls.' Br. 22).  But again, this simply mirrors the allegations in *Twombly*, 127 S. Ct. at 1971, and the Court there still found the complaint insufficient.  As one court put it, if "a motive to achieve higher prices" were sufficient, every company in every industry could be accused of conspiracy because they all "would have such a 'motive.'"  *In re Baby Food Antitrust Litig.*, 166 F.3d at 133.  A leading antitrust treatise also states that "[m]otivation to enter a conspiracy is never enough" to show an agreement.  VI Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1411, at 68 (2d ed. 2003).

### 4.  Price Leadership

The plaintiffs also argue that a "tradition of following the price leadership" of one firm can suggest a conspiracy (Pls.' Br. 21), but the complaint does not allege such a tradition.  *See* Docket No. 63 (Compl. ¶¶ 83-87).  And even if there were a pattern of price leadership, "[a] section 1 violation cannot . . .  be inferred from . . . an industry's follow-the-leader pricing strategy."  *In re Citric Acid Litig.*, 191 F.3d at 1102.

### 5.  Similar Cost Structures

The plaintiffs also claim that similar cost structures are a plus factor that may support an inference of conspiracy.  They acknowledge, however, that they "did not specifically allege that defendants have similar costs."  Docket No. 94 (Pls.' Br. 21).  And even if the plaintiffs had made such an allegation, it would not have been sufficient to infer a conspiratorial agreement.  If anything, similar

13

cost structures would explain why the defendants' prices would naturally be similar without the need for any agreement. *See* Donald F. Turner, *The Definition of Agreement Under The Sherman Act: Conscious Parallelism and Refusals To Deal*, 75 HARV. L. REV. 655, 662 (1962) (explaining that where sellers have identical costs, no inference of conspiracy can be drawn from the fact that they charge identical prices).

### 6. High Barriers to Entry

The plaintiffs also contend that a conspiracy is plausible because "entry in the payment card market is exceedingly difficult," so that a pricing conspiracy would generally be protected from competition. Docket No. 94 (Pls.' Br. 22). But the complaint does not allege that entry barriers are high. Moreover, the plaintiffs themselves acknowledge that the industry is in general "fiercely competitive." *Id.* at 16.

### 7. Parallel Price Increases that Bear no Relationship to Costs

Finally, the plaintiffs argue that "rapid increases in price unjustified by changes in defendants' costs" are suggestive of a conspiracy. *Id.* at 20. Even if this were true when there is no independent explanation of the price increases, the complaint here provides just such an alternative explanation. It shows that late fees began increasing after the Comptroller of the Currency promulgated a regulation in 1995 providing that credit card issuers were not bound by state regulations concerning late fees, and that these increases provided a way for card issuers to recapture revenue they lost from other sources due to competition among the very companies here alleged to be conspiring. *See* Docket No. 63 (Compl. ¶¶ 3, 62-64). Given these "natural explanations" for the increases in late fees, those increases do not support any inference of conspiracy. *See Twombly*, 127 S. Ct. at 1972 (rejecting inference of conspiracy where there was "an obvious alternative explanation" for the allegedly parallel conduct).

The Court concludes that none of these allegations moves the claim of conspiracy from the realm of the "conceivable" to the "plausible" in light of the context here indicating that the defendants' "parallel conduct . . . could just as well be independent action."

For these reasons, the plaintiffs have failed to plead a case adequate under applicable law to state

14

a claim for relief under section 1 of the Sherman Act, and therefore Count Five is dismissed. Count Eight alleges the same claim under California's Cartwright Act. Because "analysis under California's antitrust law mirrors the analysis under federal law," Count Eight shall also be dismissed. *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001).

**C.    Counts Six, Seven, Nine, and Ten (California State Law Claims)**

The plaintiffs assert four additional state law claims: violations of the California Unfair Competition Law (UCL) (CAL. BUS. & PROF. CODE §§ 17200 *et seq.*); the Consumers Legal Remedies Act (CLRA) (CAL. CIV. CODE §§ 1750 *et seq.*); breach of the covenant of good faith and fair dealing; and unjust enrichment. Each of these counts fails as a matter of law to state a claim on which relief can be granted.

**1.    Count Six (Unfair Competition Law Claim)**

Count Six asserts that because the defendants' late and over-limit fees purportedly violate the federal banking laws or the antitrust laws, they are also "unlawful" and "unfair" and that the concealment of their illegality from cardholders is a "deceptive" practice in violation of California Business and Professions Code sections 17200 *et seq. See* Docket No. 63 (Compl. ¶¶ 131-36). Because the plaintiffs' theories are explicitly premised on the assertion that the fees violate federal law and the Court has determined that no such claim has been stated, the UCL claim is not cognizable. Moreover, the Supreme Court has held that challenges to the levels of a national bank's late fees under the UCL are preempted by the NBA. *Smiley*, 517 U.S. at 738 & n.1, 744, 747. Finally, under the substantive terms of the UCL, the defendant banks could not properly be deemed to have engaged in unfair or deceptive practices under the statute by acting consistently with all existing legal interpretations of the NBA and with the express disclosures of their contracts concerning late and over-limit fees. *See, e.g.*, *Olszewski v. Scripps Health*, 30 Cal. 4th 798, 828 (2003) (statute provided safe harbor from UCL claim even though subsequently invalidated); *Byars v. SCME Mortgage Bankers, Inc.*, 109 Cal. App. 4th 1134, 1147-48 (2003) (where particular "conduct has been deemed lawful," it cannot provide the basis for a

15

section 17200 cause of action); *see also Evans v. Chase Manhattan Bank USA, N.A.*, 2006 WL 213740, at *6 (N.D. Cal. 2006) (actions consistent with the "fully-disclosed terms of the contract . . . cannot plausibly be labeled a deception").

### 2.   Count Seven (Consumers Legal Remedies Act Claim)

Count Seven alleges that the defendants' fees violate California Civil Code section 1750.  *See* Docket No. 63 (Compl. ¶¶ 137-42).  The plaintiffs' theory again appears to be that illegality under the federal claims gives rise to liability under this California statute.  This count is accordingly dismissed; the Court already has found no claim stated under federal law.  Moreover, as with Count Six, the state law claim is preempted by the NBA.  *See Smiley*, 517 U.S. at 738 & n.1, 744, 747.  Indeed, the plaintiffs did not contest defendants' argument on preemption of the CLRA claim.

The plaintiffs' CLRA claim must also be dismissed because, as California appellate courts have held, credit card accounts are not "goods or services" subject to that statute.  *Berry v. Am. Express Publ'g, Inc.*, 147 Cal. App. 4th 224 (2007) (discussing CAL. CIV. CODE § 1770(a)).  Every federal court addressing the issue has followed this precedent.  *See Van Slyke v. Capital One Bank*, 503 F. Supp. 2d 1353, 1358 (N.D. Cal. 2007); *Augustine v. FIA Card Servs., N.A.*, 485 F. Supp. 2d 1172, 1175 (E.D. Cal. 2007).[9]

### 3.   Count Nine (Good Faith and Fair Dealing)

Count Nine contends the defendants' fees violate the implied contractual covenant of good faith and fair dealing because the fees are punitive damages prohibited by the federal banking laws.  *See* Docket No. 63 (Compl. ¶¶ 146-48).  This claim fails automatically with the dismissal of the underlying federal banking law claims and because the plaintiffs do not contest its preemption.  *See Smiley*, 517 U.S. at 738 & n.1, 744, 747.  In addition, the plaintiffs concede that the fees under challenge are

---

[9]   The plaintiffs have argued that credit card accounts are "goods or services" as that phrase is used in other statutes, but those *different* statutes are inapposite, especially in light of the particular legislative history of the CLRA making it clear that the legislature intentionally excluded credit.  *See, e.g.*, *Van Slyke*, 503 F. Supp. 2d at 1358-59; *Augustine*, 485 F. Supp. 2d at 1175.

explicitly provided for in cardholders' contracts, and therefore this claim independently fails under the well-settled principle that the implied covenant cannot prohibit that which the contract specifically permits. *See Carma Developers v. Marathon Dev.*, 2 Cal. 4th 342, 374 (1992). The plaintiffs' brief does not contest dismissal on these theories.

### 4.   Count Ten (Unjust Enrichment)

The plaintiffs' last claim, Count Ten, must also be dismissed. First, there simply "is no cause of action in California for unjust enrichment." *Melchior v. New Line Prods., Inc.*, 106 Cal. App. 4th 779, 793 (2003). "Unjust enrichment is a general principle, underlying various legal doctrines and remedies, rather than a remedy itself." *Id.* (citations and quotations omitted). Moreover, the plaintiffs' claim of "unjust enrichment," does not allege any distinct purported impropriety, but depends entirely on the allegation that the defendants benefitted from actions that are unlawful under other theories of liability in their complaint. *See* Docket No. 63 (Compl. ¶¶ 149-55). Accordingly, this claim must necessarily be dismissed when the other claims are dismissed.

### CONCLUSION

Accordingly, the Court GRANTS the defendants' joint motion to dismiss [Docket No. 91]. The plaintiffs' consolidated complaint is DISMISSED without prejudice. The plaintiffs have the Court's leave to submit an amended complaint that would be viable under the law as stated in this order, if they can do so in good faith, within 20 days of the date of this order. Should the plaintiffs file an amended complaint, the defendants shall have 30 days to answer or otherwise respond.

IT IS SO ORDERED.

November 16, 2007

_____
Saundra Brown Armstrong
United States District Judge